UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| NYQUEST ALLEN AKA NYEQUEST ALLEN, | L.R. 15.1 |
| PLAINIFF, | CIVIL ACTION COMPLAINT<br>(PRO SE PLAINTIFF-PRISONER) |
| -AGAINST- | CASE No. 9:24-CV-00332 (LEK/TWD) |
| SANDERSON, Et Al., | JURY TRIAL DEMANDED |
| DEFENDANTS. | |

PLAINTIFF'S AMENDED &
SUPPLEMENTED COMPLAINT

*Nyequst Allen*

NYEQUEST ALLEN, ICN No.15000405

NYEQUEST ALLEN ("PRINCIPAL")

Onondaga County Justice Center

555 South State Street

Syracuse, New York 13202-2104

*Saio Barzee*          (*SB-Z)

SAIO BARZEE (AGENT)

PLAINTIFF'S "POWER OF ATTORNEY"

Onondaga County Justice Center

555 South State Street

Syracuse, New York 13202-2104

I.                          LEGAL BASIS FOR CLAIM

This is a civil action seeking relief and punitive damages to defend and protect the rights guaranteed by the constitution of the United States of America.

This action is brought pursuant to 42 U.S.C. section 1983, ensuing from the violation of plaintiff's Federal Constitutional rights.

The court has jurisdiction over the action pursuant to 28 U.S.C. 1331, 1343(3) and (4), and 2201. This Cause of Action arose in the Northern District of New York. Therefore, venue is proper under 28 U.S.C. section 1391(b).

This civil action is seeking to sue all of the herein named Defendants in their individual capacities.

II.                         PLAINTIFF INFORMATION

Nyequest Allen aka Nyquest Allen, Incarcerated Individual's number (ICN No.) # 15000405, ONONDAGA COUNTY JUSTICE CENTER, 555 South State Street, Syracuse, New York 13202-2104.

III.                        PLAINTIFF-PRISONER'S STATUS

Incarcerated Individual: Pretrial Detainee

IV.                         DEFENDANT(S) INFORMATION

DEFENDANT #1: (Deputy) Alton Apples (Badge No. #2970)(Position: Team Leader—5'11 202 lb. & 31 years old)(Has a reputation of battering incarcerated individuals within the Onondaga County Justice Center), ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #2: (Deputy) Matthew Murphy (Badge No. #2846)(Position: S1—5'11 180 lb. & 40 years old)(has training in MMA fighter techniques), ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #3: (Deputy) Randall Sanderson (Badge No. #4144)(Position: S2—6'2 246 lb. & 48 years old)(alleged ex- professional boxer/MMA fighter)(Also has a reputation of beat on incarcerated individuals within the Onondaga County Justice Center and is even alleged to have transferred to the Onondaga County Justice Center as a result of getting in trouble for killed an incarcerated individual while working as a deputy in the Onondaga County Jamesville Correctional Facility), ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #4: (Deputy) Joseph Lee (Badge No. #2634)(Position: S3—5'5 230 lb. & 46 years old), ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044: SUED IN: Individual Capacity

DEFENDANT #5: (Deputy) Jonathan Hagenmayer (Badge No. #2945)(Position: S4—5'10 180 & 34 years old), ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENANT #6: (Deputy) Phillips, ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #7: (Deputy) Lieutenant Daniel Lavy (Badge No. #2551 ), ONONDANGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #8: (Deputy) Jeremy Corsaro (Badge No. #2956), ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #9:  (Deputy) Kolakowski, ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #10: (Deputy) Sergeant Keeney (Badge No. #2899), ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #11: (Deputy) Sergeant Dustin Saddock (Badge No. #2438), ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #12: (Deputy) Sergeant Marc Sarno (Badge No. #2889 ), ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #13: (Deputy) Captain Jammie Blumer (Badge No. #2598), ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #14: (Deputy) "John Does or Jane Roe" watch Commander (Badge No. 2740), ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #15 (Deputy) "John Doe or Jane Roe" Chief (Badge No. #2606), ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #16: (Deputy) Lieutenant David Squairs, ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #17: (Deputy) Assistant Chief Ferguson, ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #18: (Detective) R. Dobrowolski, ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #19: (Sheriff) Tobias J. Shelley, ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #20: (Deputy) Chief John S. Drapikowski, ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #21: (Deputy) Connor Hanauer, ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #22: (Deputy) Conner (Badge No. #4197), ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202-2104, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #23: (Deputy) V. Hujdur, ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202, phone number (315) 435-3044; SUED IN: Individual Capacity

DEFENDANT #24: (Deputy) Dasilva, ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202, phone number (315) 435-3044; SUED IN: Individual capacity

DEFENDANT #25: (Deputy) Earl, ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202, phone number (315) 435-3044: SUED IN: Individual Capacity

DEFEDANT #26: (Deputy) Quku, ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202, phone number (315) 435-3044; SUED IN: Individual capacity

DEFENDANT #27: (Commissioner) Yolanda Canty, Commission of Correction, 80 South Swan Street, 12th Floor, Albany, New York 12210, phone number (518) 485 2346; SUED IN: Individual Capacity

DEFEDANT #28: DSBA UNION, Onondaga County Justice Center Deputies Union, 555 South State Street, Syracuse, New York 13202-2104; SUED IN: OFFICIAL Capacity

DEFEDANT #29: (Deputy) Casey McPartland, ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202, phone number (315) 435-3044; SUED IN: Individual capacity

DEFEDANT #30: (Detective) Sergeant Stark , ONONDAGA COUNTY SHERIFF'S OFFICE, 407 South State Street, Syracuse, New York 13202, phone number (315) 435-3044; SUED IN: Individual capacity

## V.                      STATEMENT OF CLAIM

PLACE OF OCCURRENCE:  Onondaga County Justice Center, 555 South State Street, Syracuse, New York 13202-2104, phone number (315) 435- 1770

DATES OF OCCURRNECES: See, all dates cited herein.

### PREVIOUS LAWSUITS BY PLAINTIFF

This Court should note that the herein named Plaintiff has never previously before raised a Civil Action Complaint pursuant to 42 U.S.C. §1983 but does assert that he also has a pending civil action case, see case No. 9:24-CV-0866 (GTS/DJS), which was commenced after this case was filed but before this amended and supplemented complaint was granted by this District Court; and that Plaintiff has filed no other lawsuits dealing with the same facts involved in this action or otherwise relating to his punishment except as already declared herein with the declaration that this is the Plaintiff's amended and supplemented complaint.

### FACTS

Plaintiff, Nyequest Allen aka Nyquest Allen (ICN NO. 15000405), originally commenced with this civil action as a pro se prisoner-Plaintiff but has now willingly, knowingly and voluntarily selected to proceed with having incarcerated individual Saio Barzee (ICN NO.11001866) act as Nyequest Allen aka Nyquest Allen (ICN NO. 15000405) "Power of Attorney" and therefore Saio Barzee is the legal AGENT for the Plaintiff ("Principal"); and thus thereafter also willingly, knowingly, voluntarily gives full consent for Saio Barzee to legally handle all responsibilities and control of litigating and mitigating all further Civil matters and proceedings pertaining to this

case under docket number 9:24-CV-00332 (LEK/TWD). Wherefore, upon information and belief, Saio Barzee (Plaintiffs "Power of Attorney" and or "Agent") herein asserts and submits that there are genuine issues to be tried with regard to the following material facts:

## BACKGROUND

1. The Plaintiff was housed in the General Housing Unit of the Onondaga County Justice Center on Saturday the 25th day of November 2023, as a result of getting into a physical altercation with incarcerated individual Ames Malo.

2. Thereafter, from approximately the beginning date of Monday November 27th 2023 to Thursday November 30th 2023, deputies then started to wrongfully inform other incarcerated individuals being housed in the General Housing Unit that the Plaintiff was "dropping slips snitching" on other incarcerated individuals. Defendant (deputy) Conner (Badge No. #4197) further escalated the deputies wrongful actions by disclosing the slips that the Plaintiff had attempted to provide to the administration office which revealed that the Plaintiff was requesting to be housed in the specific pod floor of 3B within the Onondaga County Justice Center inorder to avoid having problems with other incarcerated individuals being housed in the 2B housing Pod and whom the Plaintiff had personal issues with ensuing from prior life threatening town differences.

3. Embarrassed and scared, Plaintiff then started to verbally argue with the other incarcerated individuals who were calling him a "rat" "police" and a "snitch", this including incarcerated individual Ames Malo, along with Plaintiff's now "Power of Attorney" Saio Barzee and incarcerated individual Hemingway who was being housed in 13 cell of the General Housing Unit and the "John Doe" incarcerated individual being housed in 12 cell.

4. The Deputies actions further cause the Plaintiff to suffer from extreme emotional distress and psychological pain as a result of the Deputies wrongfully classifying the Plaintiff under general population status before then maliciously housing Plaintiff in the reception Pod of 2A and around Ames Malo who is not only the same incarcerated individual that Plaintiff had just gotten into a physical altercation with a month prior but whom is also one of the people that the Deputies had wrongfully disclosed the confidential information about Plaintiff to.

5. And thus, a competent person would conclude that the Deputies' unjustifiable disregard of the foreseeable and potential risk to Plaintiff's health and safety as evidence of intentional failure to protect that caused the Plaintiff harm regardless of the fact that there was a separation order placed on Ames Malo and the Plaintiff. This sadistic infliction of pain quickly became the Plaintiff's reality, as other incarcerated individuals started calling Plaintiff a rat and started to attempt to bait the Plaintiff into a physical altercation.

6. The Deputies thereafter attempted to actually cause the Plaintiff physical injuries by informing the Plaintiff that the facility will, upon the completion of his reception, be housing Plaintiff in Pod 2B where the Plaintiff has numerous of enemies that wanted to inflict serious bodily injuries upon the Plaintiff.

7.  The medical department of Onondaga County Justice Center has evidence which documents that the Plaintiff, on Saturday the 31st day of December 2023, suffered chronic injuries from an Unsp. Injury to L5 level of lumbar spinal cord, init. Encntr. and from nerve chronic injuries relating to Epilepsy, unsp., not intractable, with status epilepricus which Gloria Maria Darden confirmed came from acute external causes relating to the accidental discharge from unsp. Firearms or gun init. encntr. and which also thereafter caused the Plaintiff to suffer chronic psychological pain such as from unspecified anxiety disorder and from unspecified adjustment disorder, and that the plaintiff has an acute psychological problem with oth. Psychoactive substance use, unspecified with unspecified disorder.

8.  These medical diagnoses and facts provided in the medical reports confirmed by Gloria Maria Darden when viewed in the light most favorable to the said Plaintiff and along with the fact that Krista Shuffetta had also confirmed, on Friday December 30th 2022 that Plaintiff suffers from supplementary acute injuries as a result of having personal history of other mental and behavior disorders, shows that the wrongful actions committed by the Deputies was not only inflicted as a form of cruel and unusual punishment but that the Deputies' wrongful actions also thereafter maliciously placed the Plaintiff's health and safety at a highly continued risk of being seriously harmed both within the prison environment and upon Plaintiff's release back into regular society.

9.  In extreme fear of suffering from serious bodily harm, Plaintiff felt it compelling to request for protective custody. However, Plaintiff's request was not granted until after Plaintiff first submitted numerous of written request asking for protective custody.

10.  Onondaga County Justice Center Deputies placed an administrative segregated incarcerated individual by the name of Jamal Works in the eight man unit which is an area designated for incarcerated individuals in protective custody as an attempt to cover up for their wrongful act of battering Jamal Works.

11.  Onondaga County Justice Center Deputies were thereafter vigilantly and specifically watching to see if incarcerated individuals whom were being housed in the eight man unit of Special House Unit #1 were being bribed into letting administrative segregated incarcerated individual Jamal Works put financial funds into their inmate accounts inorder to make commissary purchases on the beneficial behalf of Jamal Works.

12.  The Plaintiff was moved to the eight man unit on or around the middle of December 2023 after having numerous of unsolved issues with other incarcerated individuals on Pod 2A. The Plaintiff was housed in 20 cell of SHU unit #1 while Jamal Works was being housed in 18 cell of SHU unit #1.

13.  It was at this time, that Plaintiff built a trusting bond with administrative segregated individual Jamal Works and which also thereafter lead to Plaintiff allowing for Jamal Works to put money into the Plaintiff's inmate account so that both the Plaintiff and Jamal Works could get commissary items, such as food and hygiene products, and inorder to also allow both the Plaintiff and Jamal Works to use the phone.

14.     The mutual benefit of their relationship was, however, quickly noticed by the Deputies working within the eight man unit of the Onondaga County Justice Center and which was thereafter also brought to the attention of Defendant Alton Apples, who also happened to be a named defendant in Jamal Works 42 U.S.C. section §1983 Civil Action.

15.     Unbeknown to the Plaintiff, Defendant Huldjor and Defendant Alton Apples then started to personally watch and review the video and audio footages recorded from the cameras of SHU unit [#]1, inorder to observe the Plaintiff's actions and thus verified that the Plaintiff would, indeed, drop mail off in the mailbox for Jamal Works along with sneak food to Jamal's cell while the floor Deputies were not looking or were making a tour around the Pod.

16.     At some point, approximately 2 days prior to Jamal Works being moved out of the eight man unit of Special House Unit [#]1, Plaintiff asserts that Defendant Huldjor warned the Plaintiff about his actions during the service of chow by stating that Nyequest Allen had to be slicker than that because of the fact that Defendant Huldjor was always watching.

17.     Immediately thereafter, but within the couple of days prior to Jamal Works' departure, Defendant Alton Apples committed aggregated harassment during the service of chow by the said Defendant hawkishly staring at Plaintiff's tray in a manner which compelled the Plaintiff to ask defendant Alton Apples why he was looking at his tray like that. The Plaintiff, upon rational reasoning, asserts that he truly believed that his food was egregiously tampered with and thus felt that it would have been extremely gross and unhealthy for him to eat anything other than the noodles that were on his tray stemming from the fact that defendant Alton Apples disrespectfully answered Plaintiff's question by declaring that he had spitted on the food in Plaintiff's tray.

18.     Therefore, Plaintiff wrote a grievance complaint against defendant Alton Apples for stating that he had spitted on the food in the Plaintiff's tray. However, the Plaintiff asserts that the facility never properly commenced wit filing Plaintiff's grievance.

19.     On, or soon-thereafter, the 29th day of December 2023, Deputies removed incarcerated individual Jamal Works from the eight man unit of special housing unit [#]1, as a result of being frustrated with the fact that they were not able to successfully isolate nor deprive Jamal Works from being able to socialize and have contract with other incarcerated individuals in the eight man unit.

20.     After first ignoring the hidden malicious threat disguised by defendant Huldjor as a warning the Plaintiff was then wrongfully subjected to suffer from further psychological pain which was egregiously inflicted upon the Plaintiff by Defendant Alton Apples as a form of retaliatory treatment used inorder to further attempt to deter the Plaintiff from being friends with Jamal Works and when that didn't work, Deputies thereafter wantonly and unnecessarily caused Plaintiff to suffer from being maliciously battered by Defendants Alton Apples, Randall Sanderson and Matthew Murphy while defendants Jonathan Hagenmayer and Joseph Lee aided by holding the Plaintiff down on Sunday the 7th day of January 2024.

21.   Plaintiff was watching television on Sunday January 7th 2024 while being housed in the eight man unit of Special Housing Unit#1 with incarcerated individual Kevin Clark, who was located in SHU 16 cell of the eight man unit (SHU Unit#1). After some good amount of time watching television, incarcerated individual Kevin Clark then decided to use the SHU-1 Pod floor phones which are still within view sight of the Television. The Plaintiff was the only incarcerated individual then left seated in the chairs designated as the area for incarcerated individuals to watch television which is also directly near the Deputy's stationed desk area. Plaintiff asserts that he had gotten tired of watching the football game and decided that it would be a good time to change the station since he was the only one still seated in the Television designated seat area, and thus initially asked Kevin Clarke if the said incarcerated individual cared if the Plaintiff changed the TV station. Plaintiff asserts that he specifically had asked Kevin Clark if he could change the station because of the fact that Plaintiff was being considerate of the fact that Kevin Clark wanted to watch the football games in order to find out if one of his family member's football team had won their game or not and because of the fact that the Plaintiff also knew that Kevin Clark simply liked watching football and was probable still watching the football game even though the said incarcerated individual was using the phone.

22.   Plaintiff asserts that he then asked defendant Jeremy Corsaro, to change the station after Kevin Clarke had indicated that he did not care if the Plaintiff change the TV Station or not. Plaintiff asserts that he had respectfully asked Defendant Jeremy Corsaro, whom was responsible of supervising the SHU-1 housing unit, in order to ask for the defendant to please change the channel with the remote control that only deputies are allowed to use. Plaintiff asserts that Defendant Corsaro got mad and stated you watch what I want. Thereafter, a verbal disagreement between the Plaintiff and Defendant Jeremy Corsaro, stemming from the fact that the Plaintiff asserted that the defendant cannot do that  which triggered for defendant Jeremy Corsaro to declare that the Plaintiff is not about to run the TV and that the housing unit will simply watch what the defendant decided to watch.

23.   Plaintiff asserts that the unprofessional comments used by defendant Jeremy Corsaro left him unexpectedly dumbfounded for a second and so the frustrated Plaintiff therefore replied by asking the defendant for an explanation of why the Defendant was talking to the Plaintiff like that before thereafter informing Defendant Corsaro that the said Deputies responsibility was on supervising the incarcerated individual and that Plaintiff request should not be of any problem to the defendant since Kevin Clarke indicated that he did not care what station the Television was set to.

24.   Plaintiff asserts that Defendant Jeremy Corsaro unprofessionally and disrespectfully denied the Plaintiff's request before blatantly declaring that the defendant did not care about anything that the Plaintiff had to say. The frustrated and upset Plaintiff therefore then responded in a similarly disrespectful manner back by stating "you're acting like a bitch".

25.   Defendant Jeremy Corsaro then wrongfully, with intentional malice, asked for the Plaintiff to repeat himself in such an aggressively combative manner that provoked a verbal argument with the Plaintiff. Within the heat of the moment the Plaintiff assert that mistakenly repeated his comment which then caused for Defendant Corsaro to tell the Plaintiff to lock in.

8

Plaintiff asserts that he quickly realized that he had fallen into the said defendant's entrapment by letting his emotions get the best of him and thus attempted to then cure the mistake by stating " I apologize, I was  wrong". Plaintiff's resolution attempts fell on deaf ears as the said defendant still told the Plaintiff to go and lock in his cell. Plaintiff thereafter stated "are you deadass? For what?"… "I was trying to watch the TV".

26.    At this time Defendant Corsaro then notified, via the walkie-talkie, for an emergency response to SHU-1 because of a refusal to lock-in, as the Plaintiff was getting up in order to begin walking up the flight of stairs towards his cell.  Defendant Randall Sanderson and Matthew Murphy then ran into the Eight-man Unit (SHU-1). Plaintiff asserts that he suffers from a back injury and thus is supposed to have a flats order (meaning the facility is only supposed to allow for him to be in a cell on the ground level of every housing unit which he goes to) due to the fact that his back injury made it really challenging for the Plaintiff to get down on the floor without wrongfully enduring intolerable pain. Plaintiff assets that this fact prevented him from being able to quickly lay on the ground and so he just simply raised his hands up in a non-combative manner inorder to show the SERT response team that he is not resisting their order to get on the ground.

27.    Plaintiff assert that it was at this time that Defendants Randall Sanderson and Matthew Murphy grabbed the Plaintiff and used force to control the Plaintiff urgently on to the floor. Plaintiff asserts that he did not resisted but that he rather instead complied by allowing for the Defendants' momentum to guide him to the floor while still being attentive and mindful by listening to and following the rest of the orders and instructions given to him by the defendants. Plaintiff asserts that he did not attempt to struggle with the defendants but rather instead continue to comply without any form of conflicts occurring during the use of force and that he thereafter allowed for the defendants to apply handcuff which kept Plaintiff's hands mechanically restrained behind his back while Plaintiff was laying facedown, horizontally, on the floor.

28.    Defendant Randall Sanderson and Matthew Murphy then used their bodyweight to immobilize the Plaintiff on the floor. However, the defendants bodyweight caused significant amount of pressure to the Plaintiff's back which immediately trigger for the Plaintiff to notify the defendants that they were actually causing the Plaintiff to unnecessarily suffer from extreme amounts of agonizing and excruciating pain in his back[1]. Plaintiff continued to complain about the pain he was suffering from in his back and even  informed the defendants that he had gotten shot and that he still has a bullet in his back before thereafter begging for the defendants to get off of his back.

---

[1] While Plaintiff was admitted, from the 16th to the 28th day of July 2021, to the trauma service for acute trauma care at Upstate Hospital, physician Luca, Michael Do determined, upon secondary diagnoses, that Plaintiff suffered from an injury of cecum, small bowel laceration, right ureteral injury, hemorrhagic shock, an inferior vena cava injury and from an open fracture of lumbar vertebra with spinal cord injury as a result of a gunshot wound which required for the reopening of recent laparotomy, primary bowel anastomosis x2, with closure – confirmed by doctor Hassan end of procedure (N/A), and for the Plaintiff to return to Upstate Hospital three days later for the completion and re-evaluation of prior procedures performed.

29.     The Plaintiff asserts that the defendants maliciously ignored Plaintiff's concerns as he continued to complain about the distressingly aggregated amount of pain he was suffering from in his back and that the defendants nonetheless just simply applied more pressure on the handcuffs causing them to tighten on Plaintiff's wrist. Plaintiff then attempted to notify the defendants that the cuffs had just gotten tighter around his wrists and thus were too tight before asking the defendants to please loosen the cuffs. Plaintiff asserts that he specifically informed the defendants that the cuffs were causing him extreme pain without getting any form of resolution nor cure from the defendants whom again were simply just ignoring him.

30.     At some time during this procedure, Defendant Alton Apples wrongfully kicked the Plaintiff in his face for no apparent reason while the Plaintiff was laying on the ground. Plaintiff asserts that he did not provide any form of resistance nor attempted to strike any of the said defendants nor any other deputies in response to the malicious conduct but did ask Defendant Alton Apples why the fuck you just kicked me like that.

31.     The Plaintiff further continues to repeatedly ask for the defendants to loosen the mechanical restraints of the handcuffs on Plaintiff's wrist during the entire escorting procedure from the beginning time of when the SERT Team initially lifted Plaintiff off of the floor to after the Plaintiff was escorted from the Eight-Man unit of SHU-1 to 39 cell of the "big box" of SHU-3. Plaintiff's request for relief were made in a respectful manner and were genuinely pled out of concern for his own wellbeing.

32.     Plaintiff thereafter, upon realization of the SERT team's lack of care in adequately conducting their responsibilities in a professional manner and upon realization of the defendants' lack of sympathy for the Plaintiff's health and safety, then informed the Defendants in a scared manner that he did not want any further problems with the Defendants as a means of preventing any further malicious actions or injuries from wrongfully being inflicted upon him as he was being physically directed into 39 cell of SHU-3.

33.     After entering 39 cell of SHU-3, Plaintiff was then instructed to kneel down on the bare mattress already laying on the floor in the middle of the cell. Plaintiff immediately complied with all of the orders given to him by the defendants. Plaintiff asserts that he screamed Ahh because of the fact that the cuffs on his wrist were hurting but that he did not disobey any of the SERT Team order.

34.     It was at this time that defendant Randall Sanderson assumed control of Plaintiff's left arm and of the left side of Plaintiff's body while Defendant Matthew Murphy obtained control of Plaintiff's right arm and of the right-side of the Plaintiff's body, before the said defendants then roughly placed the rest of Plaintiff's upper body onto the bare mattress. Plaintiff asserts that he remembered see Defendant Alton Apples inside of the cell while he was being directed onto the mattress and thus assumes that the said defendant had assumed control of Plaintiff's lower body be standing in the area over the Plaintiff's feet.

35.     The area designated for living within each cell, are actually very dangerous areas for incarcerated individuals due to the fact that the facility cameras cannot adequately and clearly see of every activity or actions conducted in the cells. This obvious potential of being a

favorable entrapment area for deputies to batter incarcerated individuals within the Onondaga County Justice Center was quickly noticed and thus rules and regulations were put in place by the New York State Commissions of Correction which requires for an additional hand held camera surveillance to be present and recording during the entire process of all escorts, strip searches and handling of incarcerated individuals who are being newly admitted into any areas of the Special Housing Unit or in response to any emergency related issues in order to hold the members of the Sheriff Emergency Response Team (SERT Team) accountable and liable for their abuse, mistreatment and malicious act of using excessive force to wrongfully inflict serious bodily harm, injuries and or psychological pain upon incarcerated individuals. The way in which the Plaintiff was wrongfully battered by the Defendants is a prime example of why this rule was set in place.

36.     It Should be noted that Defendant Lieutenant Daniel Lavy was present for the initial malicious actions conducted by the herein named SERT Team defendants during the emergency response procedure and thus was the highest ranking Deputy and thus had the ultimate authority of supervising the control and handling of the SERT Team's actions. Therefore, a competent person and a fair minded jurist would determine, upon sound reasoning that the Defendant wrongfully failed to provide any form of cure to any of the injuries wrongfully suffered by the Plaintiff prior to the Plaintiff being placed in 39 cell of SHU-3 and that the defendant wrongfully failed to properly supervise the SERT Team members, and that his deliberate indifferent to the Plaintiff's health and safety continued as he further stood by, right outside of SHU 39 cell, along with defendants Sergeant Keeney and Deputy Joseph Lee and watched the defenseless and non-resisting Plaintiff then get severely battered by Defendants Randall Sanderson, Alton Apples, Matthew Murphy and Jonathan Hagenmayer.

37.     In this case, The Defendants entrapped the Plaintiff into the cell, without an (ERB) Emergency Response Belt being applied around the upper torso of the Plaintiff's body nor with an (EQV) Emergency Video Recording being present, where the premeditated and organized batterment was then commenced in a systematic manner which was initiated by Defendant Randall Sanderson first Pretending as if he was about to go through the regular SERT procedures authorized and required for every incarcerated individual upon their admission into the "Big Box" of Special Housing Unit three by removing the mechanical restraints from Plaintiff's wrists.

38.     However, Defendant Randall Sanderson instead wrongfully grabbed the Handcuffs before sadistically squeezing the mechanical restraints even tighter against the skin on the Plaintiff's left hand wrist with the malicious intent of causing Plaintiff further pain and injuries, and which caused the Plaintiff to loudly complain about Defendant Randall Sanderson's actions by stating what are you trying to break my arm.

39.     Defendant Sanderson then started aggressively bending the Plaintiff's left hand in an awkward position against the mechanical restraints as an attempt of using the handcuffs as a tool in aiding in breaking Plaintiff's wrist. Defendant Randall Sanderson then removed the handcuff on the Plaintiff's left hand while still having full control of Plaintiff's left hand and while defendant Matthew Murphy still had full control of the Plaintiff's right hand.

40.     It was at this point that defendants Sanderson and Murphy then wrongfully started saying stop resisting as they repeatedly punched the non-resisting Plaintiff with closed hand fist and used their knees to strike the Plaintiff's unprotected head and face while still keeping the Plaintiff's non-combative and limp hands in their control. Plaintiff assert that he remembered getting striked in the head over and over again and felt defenseless to the cruel and unusual punishment being wrongfully inflicted.

41.     The Defendants wrongfully used force, with intentional malice, in such a wantonly and unnecessarily excessive manner as a form of retaliatory treatment for the purpose of egregiously abusing and degrading the Plaintiff and which thereafter caused the Plaintiff to lose adequate control of his bodily functions, where his arms, legs and neck became numb with waves of electric painful sensations traveling as a current throughout his body from nerve damage as a result of his body being in shock before the Plaintiff then lost complete control of the mobility of his body and which thereafter subjected the Plaintiff to black out briefly only to regain consciousness to still being batter by the defendants.

42.     Plaintiff asserts that he remembers that the defendants were striking his head over and over again and felt that the most severe amount of damage was being caused from the strikes coming from the left side of his head and thus Plaintiff reasons that it was probably the knee strikes wrongfully inflicted by defendant Randall Sanderson that had to have knocked him unconscious. Plaintiff asserts that he vaguely remembers seeing Defendant Alton Apples participating in the batterment by the defendant using one of the Defendant's hands to hold the Plaintiff's body down and then plaintiff asserts that he then remembers feeling an additional amount of strikes hitting all over his body and head.

43.     Moreover, Plaintiff asserts that the hard hitting blows to Plaintiff's unprotected face and head started causing the dizzy and semi-conscious Plaintiff unbearable pain therefore the Plaintiff simply focused on protecting his head from the strikes and so he first tried to tuck his chin and hide his head away from being striked maliciously. Plaintiff asserts that he had a very difficult time protecting his defenseless face from the numerous of strikes because of the fact that the Plaintiff was already laying on his stomach and was being pulled in every which way direction from the force of the strikes being wrongfully inflicted upon him. Plaintiff asserts that he then tried to hide his upper body under defendant Matthew Murphy's body in order to attempt to better protect his face while stating "ok ok why ya'll still hitting me, I'm not even resisting" with as much energy as he could muster over the suffocating pain overtaking his head and body.

44.     Plaintiff asserts that he remembers hearing the defendants still wrongfully screaming "stop resisting" even though the defendant had already regained control of the Plaintiff left hand and had already thereafter reapplied the handcuff back onto Plaintiff's left hand wrist. Specifically, Plaintiff asserts that he heard defendant Randall Sanderson then state "go get the camera" before declaring for the other defendants to "hurry". Plaintiff assert that defendant Randall Sanderson repeatedly kept yelling stop resisting wrongfully and that the defendants still kept wrongfully striking and violently battering the non-resisting and non-combative Plaintiff.

45.    It should be noted that the act of Defendants Daniel Lavy, Sergeants Keeney and Joseph Lee initially standing outside the immediate viewpoint area of 39 cell in itself is malicious because it raises the reasonably high probability that the SHU cameras had an even harder time adequately capturing the events that transpired in the cell as a result of the defendants being blockers in the cameras line of view.

46.    Plaintiff asserts that the defendants then started recklessly cutting his clothes off. Plaintiff asserts that he remembers feeling a sharp pinching pain which kept digging deeper into the area around his upper right arm and thus thereafter reasonably concluded that the sharp pain came from being cut as a result of the Defendants recklessly cutting his clothes off of his body without caring to make sure that Plaintiff didn't suffer any more injuries.

47.    Plaintiff asserts that he again suffered from extreme pain in his back as a result of his feet being bent and folded up towards his head in a figure four position. Plaintiff asserts that he felt violated as a result of being naked in such a vulnerable position and helpless situation.

48.    Plaintiff asserts that the Defendants instructed him not to move and that he complied with all directions given to him before the defendants then quickly existed the cell and closed the door.

49.    The painfully throbbing lightheaded Plaintiff then used his numb heavy feeling arms to roll himself into a fetal position after a few seconds of attempting to catching his composure and then slowly thereafter crawled to his knees after a few more seconds before staggering to get up and started seeing small white dots clog his vision while suffering from a shortage of breath. The Plaintiff's breathing and vision only became even harder to obtain as he attempted to get his legs to walk towards the cell door so that Plaintiff could ask for help. Plaintiff managed to make it to the door but passed out before he could get the assistance that he needed.

50.    It should be noted that, initially, some of the other incarcerated individuals, who were present and being housed in the "Big Box" of special housing unit Three, were verbally playing the urban-prison version of jeopardy while they were in their cells as Plaintiff was brought into the SHU and then into 39 cell.

51.    It should further be noted that the same said incarcerated individuals stopped playing their jeopardy game once incarcerated individual Zayvon Radcliff who was being housed in 27 cell of SHU-3 which directly across from 39 cell, stated "word to El they're in there whooping his ass". Right after Zayvon Radcliff stated this comment, the other incarcerated individuals then immediately started yelling for the Defendants to stop battering the Plaintiff.

52.    It also should be noted that the John Doe and Jane Roe deputies who responded to the emergency called and who were present in that immediate area of SHU-3 then attempted to force incarcerated individuals to get off of their (and or away from their) cell doors so that they could not witness the Defendants' wrongful actions of egregiously battering the Plaintiff.

53.    It should additionally be noted that a couple of minutes went by after the incarcerated individuals start protesting for the defendants to stop battering the Plaintiff before the Defendants actually finally existed the Plaintiff's cell before then closing the door. The incarcerated individuals then started yelling that the Plaintiff needed emergency medical attention after watching Plaintiff pass out infront of his cell door.

54.    It thereafter took the Plaintiff a couple of minutes to get back up after regaining consciousness. Most of the incarcerated individuals in the SHU-3 Unit then started to provide positive and helpful instructions to the Plaintiff inorder to get the Plaintiff to drink water and simply focus on his breathing.

55.    Plaintiff asserts that nurse "Katy" (which, upon information and belief, is Nurse "Susan Sheridan") arrived infront of the Plaintiff's cell and then asserted that she would like for the Plaintiff to show her his injuries before thereafter conducted a visual observation of the cuts and bruises on Plaintiff's face. Medical Nurse "Katy" then declared that Plaintiff was right in declaring that his face did not look it did normally at that exact moment nor like it did yesterday when she saw him in SHU-1.

56.    At this time the Defendants had a handheld camera (EQV) present and thus recorded the following conversation:

NYEQUEST: "Kate look at my face….My face wasn't looking like this yesterday?"

KATE: No, it wasn't

57.    Nurse Kate them informed the Plaintiff that she is going to be back before leaving to go and get the additional medical supplies needed to adequately take care of the Plaintiff's wounds and injuries.

58.    It should also be noted that the audio and camera video footages of both the SHU and camera along with the hand held camera (EQV) thereafter recorded the Plaintiff Stating:

NYEQUEST: "Yo, Apples you're pussy…you're black, you're the same color as me…you're letting these motherfucker jump on us. I don't care if I do life, I'll smoke ya'll… take these cuffs off and I'll give you a fair one…I'll fight all of you niggas…you're not just going to jump on me and get away with it, and I bet I get a million dollar law suit."

59.    A little while later, Nurse "Kate" (which upon information and belief is Nurse "Susan Sheridan") returned with some first aid kits and with some additional medical supplies along with a "Jane Roe" nurse, whom Plaintiff thinks is name "Gigi", inorder to provide Plaintiff with the proper medical evaluation needed to cure his physical injuries.

60.    Also, it should nonetheless be highlighted that Plaintiff, no matter how mad and frustrated Plaintiff was about being wrongfully battered by the Defendants, never caused the Defendants any harm nor even attempted to do so when defendant Alton Apples opened Plaintiff's cell door, after first placing mechanical restraints on Plaintiff's wrist, inorder for

14

the said nurses to commence with their medical evaluation. It was at this time that the plaintiff was instructed by defendant Alton Apples to go sit down on his mattress (which was off of the floor and now placed properly on the bed frame). Plaintiff immediately complied with all of the orders given to him without any form of verbal confrontation or arguments.

61.    However, upon completely viewing the circumstances surrounding the defendants actions it must be determined that a competent person and a fair minded jurist would rationally conclude that the Defendants' instructions were made with the deceitful intent of maliciously covering up for the defendants' wrongdoing by preventing the SHU audio and camera video footage from being able to record the nurses' medical assessments and evaluations of the Plaintiff's injuries.

62.    The medical nurses applied saline liquid water on a cotton ball type of gauze swab before pressing the material onto the bruised and swollen areas on the Plaintiff's head and face, and before thereafter determining that Plaintiff suffered from some cuts and one serious enough laceration which needed stitches.

63.    The defendants' intentional malice became evident where Defendant Alton Apples wrongfully declared that the Plaintiff will be fine after the "Jane Roe" nurse informed the defendant (Alton Apples) that based upon her years of medical practice, she believed that Plaintiff needed to go to the outside hospital inorder to get stiches conducted on the laceration around the right-side of the Plaintiff's head.

64.    Further evaluation was conducted, which lead nurse "Kate" to determine that she would provide the Plaintiff with mouth wash inorder to help prevent the cuts suffered in Plaintiff's mouth as a result of being battered (punched) by the Defendants from being infected and or from becoming a factor that would further damage the acute oral injury being suffered by the Plaintiff[2].

65.    The medical nurses also had a clear observation that the squeezing pressure from the mechanical restraints caused Plaintiff to suffer from visible red raised trauma mark lines on the wrist of the Plaintiff and that it was highly probable that Plaintiff was at risk of suffering from nerve damage in that area of Plaintiff's wrist and should have been recommended to a hand specialist for further evaluation to be conducted and in order to see if the Plaintiff needed to be diagnosed with any chronic or acute hand injuries and or to be treated for wrist contusions and abrasions. Both of the nurses and defendant Alton Apples then existed from the Plaintiff's cell without any further form of physical altercation occurring that day.

66.    This District Court should note that the "Wellpath" Nursing Progress Notes reported by medical nurse Susan Sheridan RN on the 7th Day of January 2024 at approximately 09:17 PM EST document that:

"Called to POD for assessment of Patient post SERT move. Patient is lying on floor with eyes closed. Bottom lip bloody. Patient then got up and stood at the door. He was very

---

[2]Luay Ashkar confirmed on Friday the 15th day of December 2023 that Plaintiff suffers from a cellulitis and abscess of mouth (problem)

agitated and started screaming and threatening staff. Vitals were taken while patient sat handcuffed o bed. VSS. No obvious injury to head or extremities. Will continue to monitor."

67.    However, a light should be shined on the fact that Plaintiff herein asserts, upon information and belief, that he was actually never served, contrary to the Administration segregation notice issued by Defendant Daniel Lavy, with a misbehavior report nor any form of papers which gave him notice of the rule violation charges being brought forth against him or of the opportunity to be provided with assistance on January 7th 2024 nor within the 24 hour grace period established for incarcerated individuals before the commencement of the formal disciplinary hearing procedure.

68.    Plaintiff asserts that nurse Aja Young RN, interviewed the Plaintiff during the B Watch morning medical delivery and the sick call call-out run on Monday the 8th day of January 2024 in order to do a follow up evaluation of the Plaintiff. Upon visualization of the Plaintiff's face, nurse "Aja" stated "Ohh...I'm going to schedule you for an x-ray because your left side of your head is swollen. I want to make sure it's not fractured. The "Wellpath" Nursing Progress Note documented by Aja Young on the 8th day of January 2024 at approximately 09:36 AM EST stated that:

> | S: |

"24 year old male housed in 5B-3. Patient reports he was SERT moved to the box last night by custody staff. "they were kneeing me in the head miss!, they stabbed me with their knife when they was trying to cut my clothes off on my right arm"

"My head and my face hurts so bad. I cried all night because of the pain and I can't sleep" Patient has a history of seizures and is no compliant with seizure medication. "I wrapped my wrist"

> | O: |

BP elevated at this time. ROM to left wrist WNL, patient reports he wrapped his wrist with ACE wrap he had in his cell because it hurt. Patient movies wrist normally during encounter however, reports 7/10 aching pain.

Pt reports pain and pressure to left side of skull and ear. pt reports he feels like water is in his ear

> | A: |

Small abrasion to right arm- area is healing and scabbed over- does not appear to be fresh wound
Risk for injury
Knowledge deficient

16

69.    It should also be noted that page 3 of 3 stated that nurse Aja Young RN notified Doctor Provow via phone of her medical evaluation and that "Orders were obtained for Ibuprofen 600mg PO TID PRN x30 days, stat skull xray, and stat left wrist xray."

70.    Specifically, Plaintiff asserts that nurse Aja Young request for the Plaintiff to be placed on the schedule for his left hand wrist to be x-rayed because of the fact that it looked severely swollen and was way bigger than his right hand wrist (which also still had visible trauma marks and bruises from the squeezing pressure from the mechanical restraints).

71.    At approximately 9:20 AM EST on the 8th day of January, the "John Doe" older Caucasian man who is the regular person that almost always conducts the x-ray procedures of all incarcerated individuals within the Onondaga County Justice Center (herein abbreviated as "OCJC" Facility) then arrived to the SHU and asked for the Deputies to open the Plaintiff's cell door so that he may be x-rayed. At this time, the left side of Plaintiff's head along with the wrist of Plaintiff's left hand were x-rayed from numerous of different angles and positions. The Plaintiff was thereafter informed that the medical department will keep Plaintiff updated on the results of the x-rays; however, the medical department never actually physically provided any documentation to the Plaintiff which demonstrated the results of the x-rays as indicated.

72.    Upon discovery of legal documentations pertaining to this 42 U.S.C. §1983 lawsuit, Plaintiff was finally provided with documentations from K&A RADIOLOGIC TECHNOLOGY SERVICES, INC which reveal that the PORTABLE DIAGNOSTIC IMAGING RESULTS state that:

Richard Levy, MD reported on the 8th day of January 2024 at approximately 1:38 PM EST that he found that "there is normal Cortication, density and thickness of the calvarium. There is no acute soft tissue abnormality.

Limited evaluation of the mandibulofacial and cervical regions is unremarkable.

IMPRESSION: No abnormality is seen.

73.    It should also be noted that Darren Fitzpatrick reported that:

TECHNIQUE:
3 views of the left wrist were obtained.

FINDINGS/
IMPRESSION:

No acute fracture is noted. There is no periosteal reaction or osseous destruction. The joint spaces are preserved. The soft tissues are unremarkable.

74.    Page 1 0f 4 of the January 8th 2024 "Wellpath" Mental Health Restricted Housing rounds documentation stated that: "Pt expressed he is scared of the deputies on the pod as they are the ones who beat him up. Pt reflects that he doesn't mine RH, it's the deputies being around that beat him up that makes him feel uneasy. Pt continued on to state he feels uneasy with them leading him to the shower and when he hears keys."

75.    Also, this District Court should note that page 1 of 2 of the January 8th 2024 ("Wellpath") "Mental Health Structured Progress Note reports that: "Pt states that he is upset due to being injured during a SERT move last night. Pt reports that he hurt his wrist due to the handcuffs being too tight and also had his head injured, Pt does report that he was evaluated by medical staff and had X-rays completed. Pt states that he is upset and has been in pain. He shared that he "was not trying to resist but they moved my arm so badly I jumped in reaction to the pain. Pt denied si/hi/sib. He states he just wanted to be able to vent and get support."

76.    Plaintiff asserts that, on Tuesday the 9th day of January 2024, he called the Office of Diversity and Inclusion (which is the Onondaga County "Human Rights Department" for all incarcerated individuals being confined within the "OCJC" Facility and which inmates with free calls to their office phone (315-435-3565). Plaintiff informed the said "Human Rights" Department of what had happened to him on the 7th day of January 2024 and then provided the Human Rights staff workers with the names of the incarcerated individuals who were willing to speak up about what they had saw and heard ( Plaintiff specifically named Zayvon Radcliff who was in 27 cell and who was also able to actually see everything, and Clyde Gerbrick who was in 31 cell and was able to hear what happened and whom also told mental health worker "Adam" of what he heard happen.

77.    Thereafter, Plaintiff asserts that Human Rights worker Montinet of the Office of Diversity and Inclusion ("Human Rights" Department) actually saw and documented that the Plaintiff had trauma marks and scars still visible even after a couple of days after the incident occurred.

78.    Plaintiff wrote a complaint letter to the office of the New York State Commission of Correction located in Albany, New York in order to inform them about his complaint of being battered wrongfully and to inform them that the deputies working within Onondaga County Justice Center ("OCJC" Facility) have a history of unjustifiably causing serious bodily harm upon the incarcerated individuals being confined within the said local correctional facility.

79.    Plaintiff filed a grievance about being wrongfully battered and about the deputy wrongfully fabricating allegations against the Plaintiff in order to cover up for the fact that defendant Jeremy Corsaro initiated the confrontation and that Plaintiff never refused to lock in. However, again Plaintiff 's grievance was not properly commenced nor filed by the administrative department within the "OCJC" Facility.

80.    Plaintiff also wrote numerous of letter to Defendant Tobias Shelley in order to complain about the wrongful batterment that he suffered from and in order to also give the Sheriff notice that he is being wrongfully confined in the Special Housing Unit, and to inform the Defendant about the continued unprofessionalism and of the wrongful use of excessive force

that has repeatedly been inflicted upon numerous of other incarcerated individuals. Plaintiff's letters were never responded back to by Defendant Tobias Shelley.

81.    On January 10th 2024, Plaintiff filled out a " Health Service Request" form which stated: "on 1-7-24 I was violently kneed in the head causing marks right side by ear, then left side above temple & scars on left wrist cause of the cuffs constant pain on left side of face above temple."

82.    Plaintiff even informed mental Health worker Adam about his concerns and even showed Adam his personal injuries which the mental health worker stated that he will make sure is documented before writing noted that he personally witnessed the visible scars on the Plaintiff's wrists.

83.    Plaintiff even wrote to the office of the Mayor of Syracuse, New York in order to inform mayor Ben Walsh about being wrongfully battered by the Defendants and of how the same said Defendants that maliciously used excessive force against him also have prior history of hurting other pretrial detainees and incarcerated individuals being housed with the "OCJC" Facility.

84.    On January 12th 2024 a ("Wellpath")"Nursing Progress Note" was completed on 02:42 PM EST by K. Ritznore RN and reported: "Patient wrote sick call slip requesting a new wrap for left wrist, because there was "blood on it". Patient also complaining of left temple pain where "he got kneed in the head" from a sert move earlier in the week. X-ray taken of head and left wrist showed no abnormalities. Ace wrap replaced, no further issues addressed."

85.    Plaintiff stopped mental health worker on the 20th day of January 2024 while the Staff personnel was making rounds in the SHU-3 in order to get assistance with writing and spelling of his complaint letter which the Plaintiff was going to submit to "congress". Page 1 of 2 of the ("Wellpath") January 20th 2024 "Mental Health Structured Progress Note" reported that: "Pt stopped this writer while on the pod talking to a neighboring cell. Pt shares in a recent incident of mistreatment from security staff involving SERT specifically, Deputy Sanderson and his excessive use of unnecessary force. Pt was writing a letter to congress and asked that this writer review it to make sure it made sense and that the spelling was correct. This writer reviewed the letter and provided feedback. Pt denies any additional MH related issues or concerns."

86.    Plaintiff continued to submit "Health Service Request" forms which complained about his left ear injury. On January 23rd 204 the medical department documented (under "ear conditions" of the "Professional nursing Documentation Tool") that: "Pt placed sick call stated he was jumped on 1/7/24 and since then his left ear "feeling it has fluid in it and noises are muffled." Pt stated yesterday noticed "bloody drainage" from it. No old drainage visualize on assessment. Pt stated he took shower today."

87.    Plaintiff addressed his frustration about being wrongfully battered again on the 23rd day of January 2024. Specifically, page 1 of 3 of the ("Wellpath") "Mental Health Structured Progress Note reported that: "Pt asked to speak with MHP: Pt. made it known that he was

handcuffed in his cell and beaten up in his cell. Pt is angry and his ideas regarding taking vengeance will result in his return to incarceration, when calmer, Pt was able to acknowledge the circular reasoning that resulted in a return to being incarcerated for longer period of time. Pt needed a way to vent his frustrations. No si/hi/avh concerns." Thereafter, Page 2 of 3 reported that: "Pt was able to acknowledge that he and security staff became verbal with each other and, in anger, he verbally disrespected the officer. Pt had it acknowledged that any physical abuse suffered was unwarranted as pt's present incarceration was already a struggle for him: Pt spoke of having his arms bound behind his back as he was physically assaulted by security staff - - one deputy in particular and with another deputy looking on. Pt next reported the 2nd Deputy that participated came back to apologize and let him know that "he had to participate" in assaulting him. Pt supported and encouraged to not isolate himself. Pt also supported to seek counseling so that he's not angry and lashing out based on this experience. No si/hi/avh concerns."

88.     The Plaintiff did not only physically write about his complaints and concerns, but thereafter also verbally communicated of his injuries and of the wrongful actions inflicted upon him by the Defendants to other deputies working within SHU unit three and to there are supervisors who made rounds in the SHU-3 area and even to Notary public staff worker Deputy Charmain Mason. However, no cure nor resolution was properly provided to the Plaintiff, nor was the Plaintiff discharged or removed from the Special Housing Unit;

89.     Instead, the Plaintiff was verbally informed on Thursday the 25th day of January 2024 that he had a disciplinary hearing. Defendant Kolakowski then had an off the record discussion with the Plaintiff while the camera of the Disciplinary Hearing was turned off. At which time, Defendant Kolakowski then informed the Plaintiff for the first time since being housed in SHU Unit three that he is being charged pursuant to section §600.10 with violating numerous of rules listed in the incarcerated individuals regulation section of the Incarcerated Individual Handbook, and that a misbehavior report alleged that Plaintiff is charged further with violating section §100.17 (Harassment 1st), Section §100.20 (Threats 1st), Section §400.10 (Refusing an Order 5th), section §400.11 (Refusing an Order 4th), section §400.12 (Refusing an Order 3rd), section §400.13 (Refusing an Order 2nd), section 400.14 (Refusing an Order 1st), section §400.15 (Disorderly Conduct), section §400.46 (Disrespect 2nd) and section §400.47 (Disrespect 1st).

90.     Thereafter, Defendant Kolakowski then wrongfully bribed the Plaintiff with the disciplinary sanction of credited time served in order to both cover up for the wrongful batterment and tortful actions committed by the other deputy defendants and for his intentional act of unprofessionally waiting fourteen BUSINESS days after the incident date before commencing the formal Disciplinary Hearing. It should further be noted, contrary to the "Disciplinary Hearing/Disciplinary Plea Bargain Agreement" papers filed by Defendant Kolakowski that the defendant wrongfully denied Plaintiff of the opportunity to view the video footage recording of the incident and maliciously bribed the Plaintiff with the offer of time served only because of the fact that the Defendant had the wrongfully acknowledgment that the defendant will, abuse the power given to him and give Plaintiff an unreasonably excessive amount of disciplinary sanctions if the Plaintiff refused his offer and that appealing

his sanctions would be a waste of the Plaintiff's time because Defendant (Chief) John S. Drapikowski would not overrule his determination.

91.    Secondly, it should be noted that the Defendant wrongfully waited eighteen total days after the incident had occurred in order to give the Plaintiff's injuries time to heal before presenting the Plaintiff's face on the Disciplinary Hearing camera, and it should also be noted that this is in violation of the rules and regulations setforth under the "formal Disciplinary" Title which is in section 2) on page thirteen of the updated 3/19/2024 issue of the "Incarcerated Individual Handbook" for all pretrial detainees and other incarcerated individuals being housed within Onondaga county Sheriff's Office Justice Center ("OCJC" Facility); and which specifically stated "You will be given a Misbehavior Report listing the violations of the incarcerated individual Handbook. Your Formal Disciplinary Hearing will be **held with seven (7) business days** (weekends and holidays do not count). Included in the misbehavior report is a **Hearing Notice** that lists an approximate date and time scheduled for your hearing, at **least twenty-four (24) house prior to the hearing**."

92.    Moreover, it should be noted that the maliciousness of the nature behind how the hearing procedure was conducted along with the biasness of the hearing officer (Defendant Kolakowski) who also thereafter denied Plaintiff of his opportunity to view documentary evidence and other substantial and relevant evidence such as the video footage recording of the incidents, and of the Plaintiff right to be provided with adequate and effective assistance, caused prejudicial harm upon Plaintiff and also violated Plaintiff's ability to adequately prepare a sufficient defense, and that the cumulative prejudicial errors are a product of mental coercion which overbearingly striped the Plaintiff of his will to continue to deal with such kangaroo disciplinary hearing proceedings and also overpowered Plaintiff's sheer ability to weigh his options rationally. WHEREFORE, Plaintiff felt it compelling to enter a guilty plea instead of wrongfully being punished, under extreme confinement conditions that are considered atypical and significant hardship, for rule violations which he did not even commit.

93.    On the 25th day of January 2024 the Plaintiff reported of his mental and emotional stress with being wrongfully battered by the Defendants. The Mental Health writer documented that: "Pt placed a sick call stating "I would like mental health to note that my mind has been messed up since 1/7/2024. I hear keys jump out of my sleep. I have nightmares of Dep. Sanderson and Murphy killing." MH Met with Pt on the protective custody Pod. There was no way to have a confidential conversation however Pt consented to having discussion aloud and expressed wishes for others to overhear the conversation. Pt stated "Miss, they beat the dog shit out of me. I got my ass beat." MH provided Pt with emotional support and validated his traumatic experience. MH and pt discussed how his safety and security was violated and how this was not okay. Pt shared his family knows about the incident and he keeps close connections with his loved ones. Pt shared he feels supported inside and outside of this facility. We discuss this as a positive. Pt shared his intent to sue the deputies involved in physically assaulting him resulting in mental and emotional distress. When MH asked how MH can support his through this, Pt responded "by just being here, you are helping." Pt denied Si/Hi/Sib. Pt was educated on how to access MH services as needed. Pt will continue to be seen weekly by mental health as he is on protective custody status.

94.     At approximately 02:26 PM EST on the 26th day of January 2024, Nurse K. Ritznore RN reported that: "Patient wrote sick call slip c/o left ear being "muffled" and hard to hear since deputy altercation a few weeks ago. Patient also complaining of marks on his wrist from cuffs being too tight from same incident. Scheduled for chronic care appointment on 1/31/24, and hearing will be further assessed."

95.     Plaintiff thereafter started reporting of his uneasy felling and of how he felt paranoid around defendant Sanderson on the 27th day of January 2024 ("Per security, Pt was requesting to speak to MH. Pt reports appropriately on concerns with security staff (Sanderson) being on the pod after a recent incident involving another inmate. Pt reports not feeling safe under his supervision and is concerned for his safety. Pt was able to vent appropriately and provided resources to help pass the time during the remainder of the shift….") and also on the 29th day of January 2024 ("Pt expressed that deputy Sanderson was on their pod this past weekend and everyone was locked in, and made to feel uneasy. Pt expressed "it was a weird shift, everyone was on edge" Pt expressed he felt like he was going to be beaten at any moment").

96.     Plaintiff even skipped his chronic care appointment which was originally scheduled for January 31st 2024 because of the fact that Plaintiff did not feel safe being escorted by the same deputy who had assaulted him prior. Plaintiff, specifically, signed a "Refusal of Clinical Service" form and stated that the reason for his refusal was because: "I'm not going w/ that deputy he beat me up". Therefore, nurse practitioner R. Tangredi reported that: "Pt was requested to attend scheduled cc visit and when deputy requested to be escort. Pt refused. Pt will be rescheduled."

97.     Moreover, Plaintiff again informed mental health on the 2nd day of February 2024, that: "Security called MHP reporting that Pt was upset due to deputy Sanderson being on the pod. Pt reports that he has had many negative interaction recently with deputy Sanderson and does not feel safe around him. Pt shared that he is still having flashbacks to being handcuffed and attacked in his cell. Pt shared he felt he "had to refuse" his medical apt due to Deputy Sanderson being the one to bring him. He reports that he has been threatened by him on multiple accounts. "I don't feel safe going anywhere alone with him" Tw encouraged Pt to continue writing to administration and supervisor staff. He denies si/hi/sib."

98.     On February 4th 2024, at approximately 02:08 PM EST RN K. Ritznore reported that: "Patient rescheduled for chronic care appointment for left ear "feeling muffled", after deputy altercation. Patient scheduled for Monday with on-call provider.

99.     On February 4th 2024 Mental Health also reported that: " MH received two sick call's from pt expressing the mental and emotional distress he has been experiencing due to the unjust treatment he received on 1/7/2024. He reported he continues to experience nightmares and other PTSD related symptoms. Security informed that pt requested MH services. Pt engaged well with MH. MH provided pt with emotional support and validated his feelings/experience after enduring trauma at this facility. Pt showed MH scars from the Handcuffs as reported these as a daily reminder of what occurred. MH and pt discussed distress tolerance as he files claims and lawsuits for mental and emotional distress as well as

criminal charges. MH encouraged pt to advocate for himself appropriately. He shared he has been receiving support from peers and family. Emotional support was provided as pt is fearful of his lack of safety and security. He asked that MH document his concerns. Pt denied SI/HI/Sib and shared his short term and long term goals of getting justice for himself. Pt was educated on how to access MH services as needed. Pt will be seen weekly by MH for restricted housing follow up.

100.    On Monday the 5th day of February 2024, Onondaga County Justice Center ("COJC") medical provider Cynthia Jane Provow then conducted a hearing test on both of the Plaintiff's ears. Plaintiff asserts that the medical providers smacked some type of medical rod on the desk before placing the said rod onto Plaintiff's right ear and Plaintiff heard some noises vibrating in his ear. Medical provider Cynthia Jane Provow conducted the same test of Plaintiff's left ear and determined that the Plaintiff suffers from an unspecified otitis externa left ear chronic injury and scheduled for an orthologist specialist at Upstate Medical Center to further evaluate the Plaintiff's left ear after Plaintiff had informed her that he couldn't hear any noises out of his left ear and after not getting any physical reaction which a normal person would have done.

101.    Likewise, at approximately 05:17 PM EST on 02/05/2024, Provider Cynthia Provow reported that:

"Patient seen in clinic for complaint of marks on bilateral wrist since 01/07/2024 since handcuffs were applied in his left ear. Noted he has had some greenish drainage a few days ago, + pain.
GEN: Well appearing young AA male, NAD
Normocephalic/atraumatic, anicteric, EOMI, supple, neg lymphadenopathy
Right Ear: Mild cerumen, + TM opaque intact, neg bleeding, swelling, or pain
Left Ear: + tender pinna, + moderate cerumen, + oily, greenish discharge, +intact TM , opaque, neg bleeding
EAC: + tender, mild swelling
CTA, bilaterally, neg r/r/w.
S1-S2, RRR, neg gallops or murmurs
+ well healed mild line abdominal scar, soft, ND, NT, BS x4
Neg c/c/e, 2 + strength, decreased ROM, extension/flexion in left hand. Decreased grip strength. Right hand
with FROM

A/P: Left ear, Otitis externa. Degenerative joint decease- left hand
1. RX: Neomycin-Polymyxin-Hydrocortisone otic suspension, 4 drops in left ear QID x7 days
2. Patient with previous stab wound too left hand which he closed with glue at home. Decreased ROM in that hand . Will order PT to strengthen and improve ROM.
3. Follow up as needed"

102.    On that same day, Provider Cynthia Provow ordered for the Plaintiff to be provided with Neomycin- Polymyxin-Hydrocortisone 3.5 mg 10,000 unit/mL- 1% ear drops, susp: give 4

drop left ear QID Am Noon PM HS for 7 days, Otitis externa. Cynthia Provow also order for the Plaintiff to be provided with a refill for his (Acetaminophen) Tylenol 325 mg table and to be provided with ibuprofen 200 mg tablet.

103.    On the 7th day of February 2024, that Plaintiff started to immediately notice that the ear drops were not working effectively. Plaintiff also complained about experiencing pain in his neck. On the next day, Plaintiff reported of the fact that the eardrops were not being very effective. LPV/LVN R. Denny reported at approximately 10:29 PM EST on the 8th day of February 2024 that: "while on pod for Hs Meds Pt reports having pain in left ear and states his ear is still muffled making it hard for him to hear. Pt was advised to drop a sick call as he just recently started on ear drops and he states he feels they are not working. Charge notified. Will continue to monitor."

104.    Plaintiff continues to document of his mental health concerns and even informed mental health workers of his communication with "human rights" staff workers. The February 8th 2024 reported that: "Pt placed a sick call reporting sleep concerns in relation to being fearful of the deputies. Upon arriving on the pod Pt was observed to be standing at his door. Pt reflected that he has been feeling depressed as he found out that the deputy who beat him up had done the same to another inmate and Pt reflected that upset him more knowing it happened to another person. Pt reported that he feels like he can not defend himself and the deputies can do what every they want and act with impunity. Pt expressed that it is good for him to talk about it with MH as it keeps with human rights and he is happy with how things are progressing but reports that he still sees the deputy around and it make him feel very uneasy, and unsafe. Pt denied si/hi or any additional concerns but did request some reading on coping skill which this writer reflected he would bring accordingly."

105.    Plaintiff then started reporting of being wrongfully mistreated on the 9th day of February 2024. Specifically, a mental health worker reported that "security report Pt's request to speak to MH. Pt reports on his continued frustrations with security and mistreatment. Pt was informed that he has documented what he can and has spoken to who he can about his concerns and that at this time, until he exists the facility there likely isn't much more that can be done for him. Pt was encouraged to just focus on surviving the facility and the setting at this time. Pt requested resourced on anxiety, depression and anger. This writer was agreeable to return with resources later in the shift."

106.    Also on February 9th 2024, the Plaintiff again complained about the fact that the ear drop was not very effective. Again nurse K. Ritznore documented that: "Pt wrote sick call c/o his left ear still feels muffled. Antibiotic ear drops started 2/5/24 through 2/22/24. Patient was educated to finish antibiotic course to see f system diminish before writing another sick call slip."

107.    Approximately 06:44 PM EST on 02-12-24, nurse K. Ritznore thereafter reported that: "patient scheduled for follow up for rear "feeling muffled" from altercation one month ago. Antibiotic finished today, and systems still persisting chronic care appointment made for Wednesday 2/14/2024."

108.    Plaintiff addressed his concerns with mental health about the fact that the deputies are wrongfully battering incarcerated individuals unjustifiable. Mental Health reported of Plaintiff's concerns on the 13th day of February 2024 by documenting that: " Pt expressed one of his concerns is when Deputy Sanderson is on the pod. Pt expressed that makes him fear for his safety. Pt went on to state he is still having nightmares of being beat up by deputies and that is has been impacting his sleep. Pt continued to voice concerns for another inmate stating it hurts to know this happened to others, and is fearful that it is happening to others as we speak. Pt expressed he is more likely to sleep in or during the days now as he is not getting quality sleep at night.

109.    At approximately 10:02 AM EST on 02/16/2024, nurse L. Stonecipher reported that: "This RN went to see patient for sick call slip placed. ROI signed for record request. Meloxicam discontinued and Ibuprofen started by provider. Advised Pt ear is still healing and he will have to follow up with the provider no other issues address."

110.    Plaintiff was also transported to PRO Active PHYSICAL THERAPY on the 16th day of February 2024, inorder for further evaluation to be conducted. Nate Loughlin, DTS, OCS diagnosis assessment reported that: "Nyquest is a 24-year-old incarcerated male who presents with complaint of an injury to his left hand. He states that he had been stabbed in the ring finger on that hand. He also states that he has more pain and stiffness since January 7th when he was put into handcuffs for an extended period of time. Examination confirmed stiffness and range of motion loss of his ring finger specifically at the MCP joint, consistent with his prior injury- he did have markings on his skin consistent with placement of handcuffs, the reported some wrist pain however range of motion was good. He was encouraged to focus on active range of motion exercise, gripping, and self-mobilizing his finger joint to improve mobility.

111.    Plaintiff continued to document of his mental and physical injuries, and also documented of defendant Daniel Lavy's lack of care. Plaintiff asserted that:

"when Sanderson Murphy & Apples held me down. While I was still handcuffed * used there fist & knees hitting me over and over again.

It is 2-17-24 I still have cuff marks on both wrists mainly my right and I currently take physical therapy for left hand & wrist.

While Lt Lavy did his tour he said we handle over 12,000 inmates a year one guy gets his ass handed to him now everybody getting beat up he admited right ther and there around "4:12PM""

112.    On the 27th day of February 2024 Mental Health further report Plaintiff mental Health concerns by document that: "Although not directly related to RH Pt expressed that deputy Sanderson was on the pod Tuesday the 20th at 5:45 smirking at him from in front of his cell as if "to let e know he was untouchable". Pt reported later that day Deputies Murphy and Apples who were involved in his incident were on the pod after him. Pt expressed he does not understand how the deputies "who beat me" are allowed to be around me "like this".

113.    Approximately 02:46 PM EST on the 28th day of February 2024, Nurse Aja Young
reported that: "24 year old male seen on the unit for sick call slips re: muffled ear from an
injury on/around 1/8/24 following a use of force. "Everything sounds muffled"
BP and HR evaluated.
When this writer auscultated heart sounds- the heart beat was irregular.
Patient complains that he still cannot hear out of his left ear. he denies any drainage or pain at
this time.

Acute vs chronic pain

Reported findings to R. Tangredi NP
EKG performed by E Rodriguez, MA which was abnormal and per provider- to be repeated
on 2/28.
Pt to be seen by provider on 2/28/24"

114.    LPN/LVN Sarah Reeves ordered, on  the February 29th 2024, for the discontinuation of
Plaintiff's ear drops ((Carbamide Peroxide) Debrox 6.5 % ear drops which were order to be
used on both earing Diabetic BID AM & PM for 5 days. However, on March 1st 2024, Sarah
Reeves reorder for the Plaintiff to retry using the eardrops (Carbamide Peroxide 6.5% ear
drops) on both ears BID AM & HS for 5 days.

115.    Thereafter, nurse J. Windhausen RN reported, at approximately 10:57 AM EST on the 1st
day of March 2024, that: "TW to POD to see patient, patient currently locked in at this time.
Patient complains of continued decreased hearing from L ear. Patient states there is pressure
to L ear. Patient has a current Debrox gtt order and is scheduled to see provider on 3/4/24.
Plaintiff denies drainage from L ear. Patient denies fever/chills." It was also reported that: "#4
decay to pulp. Pt elects extraction. Starts antibiotics, then extract. OHI given."

116.    Soon thereafter, Plaintiff was then scheduled to be seen by the facility doctor whom
thereafter informed the Plaintiff that the Plaintiff would be getting provided with a medical
shot on his arm once a day for three days straight and that the medical shot was supposed to
help Plaintiff recover from his ear injury. The Plaintiff received the medical shot twice on his
right arm and once on his left arm without being provided with any cure to his ear injury;

117.    Rather instead, Plaintiff  asserts, upon information and belief, that initially all he could
hear was muzzled sounds out of his left ear after being battered by the Defendants and that
one day thereafter, but within the time frame of during the above said ear testing stages, he
woke up from being asleep inorder to use the bath room (pee) and that the heard a pop sound
in his left ear before then completely not being able to hear anything out of his left ear after
that. So Plaintiff declares that he used the handle of the spoon he had in his cell inorder to
attempt to clean the possible ear wax that he reasoned caused the pooping sound only to find
out that there was actually no ear wax and that Plaintiff had a hard time telling when the end
part of the spoon's handle was actually in his ear. Therefore, Plaintiff then out his hand over
his ear to try to clean it but nothing came out, then Plaintiff started snapping his fingers near

his left ear but couldn't hear anything, so the next morning the Plaintiff told nurse louiwiz and she scheduled for Plaintiff to see the Doctor.

118.    Plaintiff even address the deputies mistreatment of another incarcerated individuals to mental health staff on the 6th day of March 2024. Specifically, Mental Health staff reported that: "Pt explained that he continues to experience nightmares surrounding deputies beating Pt. Pt expressed it does help to talk about things and is appreciative of this writers time. Pt expressed that although he does not like cell 28 that he was not given his dinner on two occasions 3/5/24 and 3/2/24. Pt expressed that troubles him because "it can happened to anyone, it can happen to me". In addition Pt reflects he has not been receiving his grievance slips he has been requesting. For reference this writer asked deputies if Pt could receive a grievance to which they reflected they would drop him one off."

119.    Wellpath medical files reported, on the 29th day of April 2024, that the Plaintiff was determined **"Partial loss of ossicles, left ear"**. Moreover, on Monday the 1st day of July 2024, Plaintiff was finally brought to the ear, head and neck section of the medical care unit at Upstate Medical Center in order for further evaluation to be conducted on Plaintiff's left ear.

120.    While at Upstate Medical Center, Plaintiff was escorted by Deputy Bradley, a tall, skinny and blondish haired Caucasian man, to a sound proof room where a "Jane Roe" female Upstate Medical Center Doctor then placed an over the earlobe hearing aid type of medical device on Plaintiff's right ear before conducting a series of medical sound detection tests and then did the same for Plaintiff's left ear. Plaintiff was asked if he heard noises and to also at times explain what sounds or noises he heard. Plaintiff answered truthfully and it was determined that the Plaintiff could still hear out of his right ear. However, even Deputy Bradley himself had comment that "Allen you might really be deaf" after the non-reactive Plaintiff stated that he could not hear any noises nor sounds out of his left ear, which even the Deputy could hear from where he stood. The "Jane Roe" medical Doctor then informed Plaintiff that there're was a strong probability that Plaintiff's left ear drum was ruptured as a result of being wrongfully and maliciously battered by the defendants and that Plaintiff's ear injury never healed back properly and that it clearly damaged Plaintiff's ear drum and to see if there is a possibility of surgery or other emergency cure and or medical treatment available that can be used to hopefully bring Plaintiff's ability to hear back but as for now it must be determined that the Plaintiff is definitely deaf out his left ear.

121.    Moreover, it should be noted that the Defendants have repeatedly retaliated against the Plaintiff as a result of Plaintiff filing this 42 U.S.C. §1983 lawsuit against Defendants Randall Sanderson, Alton Apples and Matthew Murphy, where;

122.    While being housed in 30 cell of the "Big box" of special housing unit three, the Plaintiff asserts that, during the B Watch Shift on Monday the 11th day of March 2024, he personally heard Defendant V. Hujdur wrongfully brag about the other Defendants' maliciously using excessive force wantonly and unnecessarily to batter the Plaintiff on January 7th 2024 by the said Defendant (V. Hujdur) wrongfully referencing, in a mocking manner, to the cruel and unusual punishment egregiously inflicted upon Plaintiff as an example for other incarcerated individuals (I/I) being housed within the SHU to take notice of by declaring that the newly

admission incarcerated individual "almost got the Allen treatment" after SERT Team
Members brought the said "John Doe" I/I to 36 cell of SHU-3.

123.    Plaintiff thereafter asserts that, during the C Watch Shift on Saturday the 23rd day of
March 2024, Defendant V. Hujdur further bragged, wrongfully, about Plaintiff being battered
during a conversation with the Plaintiff while on the elevator with the Plaintiff whom was
being escorted from the Hut Unit one to the 2A "reception" pod. This time Plaintiff asserts
that he started the conversation by stating "I'm going to win my lawsuit because you said that
the inmate in 36 cell almost got the Allen Treatment," and that Defendant V. Hujdur declared
that "I don't care, I'll tell the chief that you got your ass whooped."

124.    It should also be noted that the Plaintiff asserts that he felt it necessarily compelling to get
into a physical altercation with another incarcerated individual, even though he did not want
to, inorder to attempt to protect his image among his peers within the Onondaga County
Justice Center ("OCJC") as a result of the wrongful actions committed by the Deputies and
defendant Conner, whom in the month of December 2023 had maliciously disclosed
confidential information pertaining to Plaintiff's privately made request of being housed in
specific general population housing units (also known as Pods), inorder to prevent himself
from having to get into a physical altercation with other incarcerated individuals whom he
was scared would cause him serious bodily harm as retaliation for an ongoing unsolvable
prior issues that occurred in regular society.

125.    Plaintiff asserts, while being housed in 28 cell on the 2A "Reception" pod of the
("OCJC") Facility, he got into a verbal disagreement which lead to a fight occurring and that
the verbal dispute initiated from the fact that incarcerated individuals Bradley Glowacki, who
was being housed in 6 cell of 2A pod, repeatedly called the Plaintiff a rat before stating that it
is a known fact that Plaintiff drops slips snitching on other incarcerated individuals within the
("OCJC") facility.

126.    Plaintiff asserts that during the B Watch Shift on Saturday the 27th day of April 2024, he
ran into incarcerated individuals Bradley Glowacki's cell at which time a fight between the
two said incarcerated individuals occurred.

127.    Furthermore, on Tuesday the 21st day of May 2024, Defendant Alton Apples maliciously
conducted a cell search of SHU 32 cell, which was the Housing location designated for the
Plaintiff, and while the said Plaintiff was outside of his cell for recreation during the C Watch
Shift recreation time and thereafter wrongfully retaliated against the Plaintiff for filing a
lawsuit by egregiously destroying and thereafter throwing away some of the Plaintiff's
important legal papers and personal property which the Plaintiff cherished as it belonged to
his brother.

128.    On Sunday the 25th day of May 2024, Defendant Murphy attempted to joke about being
sued by the Plaintiff by stating "tell them that I was there but didn't do anything" and on
numerous of other occasion after this lawsuit was filed, Defendant Murphy stated that "I Need
money, are you going to give me a dollar" and or mentioned the fact, in a joking manner, that

he will not allow for the Plaintiff to get recreation and or paper unless the Plaintiff dismissed or removed him from the complaint.

129.    On Friday July 5th 2024, Plaintiff got into a verbal confrontation with Defendant Daniel Lavy while the Plaintiff was being housed in 32 cell of the "Big box" (SHU-3). The said Defendant was present in Special Housing Unit three in order to help escort another incarcerated individual to the SHU. It was at this time that the following conversation transpired:

NYEQUEST: "Oh! I remember you....you were present when the deputies beat on me...you watched them beat me and SERT moved me with no small camera present."

LAVY: "Yup"

NYEQUEST: "I'm going to put you in my claim."

LAVY: "I don't care"

NYEQUEST: 'so you don't even care that they beat on me?"

LAVY: "No. I don't care, they did everything right."

NYEQUEST: "I'm going to Amend my complaint and add Deputy Lee and Sergeant Keeney, and you."

LAVY: "I don't care...STOP TALKING TO ME!"

NYEQUEST: "I'm going to add you to my complaint!"

LAVY: "I don't care...Do what you have to do...Stop talking to me, I don't care."

130.    Later on that same morning, Plaintiff then got into a verbal argument with Defendant J. Lee as a result of the herein said Defendant (Lee) wrongfully denying the Plaintiff of being provided with cleaning supplies.

131.    While the Plaintiff was taking a shower during the C Watch Shift on Saturday July 6th 2024, Defendant Randall Sanderson and Defendant Conner Hanauer (whom not only aided in the wrongful tort but was acting as a blocker so that the SHU camera couldn't adequately see into Plaintiff's cell) Maliciously conducted a cell search of 32 which was Plaintiff's designated housing location . Plaintiff thereafter finished his shower and returned back to his cell before immediately noticing that his legal papers had been disturbed with and were thereafter intentionally placed in a manner which was wrongfully left for him to see their repositioning. Plaintiff then started to ask for a grievance complaint form as a result of defendant Sanderson egregiously conducting the cell search for the sole purpose of spying on Plaintiff civil lawsuit case against the Defendant by reading the Plaintiff's legal papers.

132.    Thereafter, Plaintiff then personally asked for Defendant Dustin Saddock to provided him with a grievance complaint form as is the required procedure within the ("OCJC"). However, Defendant Dustin Saddock wrongfully stated that the Plaintiff had to "grow the fuck up", as the said Defendant was walking around during his sergeant tour in the SHU Unit three, and thereafter wrongfully denied the Plaintiff of his right to be provided with a grievance complaint form as is required by law pursuant to 9 NYCRR section §§7032.4(a) and (d).

133.    Plaintiff asserts that on the 2nd day of August 2024 a code Orange was called in, via portable radio, in the eight-man unit (SHU-1) as a result of the Plaintiff getting into a fight with another incarcerated individual. Thereafter, Plaintiff asserts that he was move to the "big box" (SHU-3) and placed in 32 cell. Plaintiff asserts that  he asked Deputy Lantry about the fact that he was missing hygiene products such as his toothpaste, hair food, Suave deodorant and his (blue) Coast bar soap. Plaintiff asserts that Deputy Lantry then maliciously informed him that he looked but that he could not find the Plaintiff's missing hygiene products. Plaintiff asserts that he told Deputy Lantry that the Deputies must have thrown away his personally property maliciously because the Plaintiff reasoned that it was not possible for the deputy to not have found his hygiene products due to the fact that Plaintiff had left the said item on desk in the cell that he was housed in.

134.    Plaintiff then attempted to get resolution by patiently waiting so that he could inform the area supervisors about his concerns. Plaintiff asserts that he spoke to Sergeant P. Lorenzo and Defendant (Sergeant) Casey McPartland . However, the said area supervisors still wrongfully informed the Plaintiff that his personal property were wrongfully missing and so the frustrated and upset Plaintiff begin to flood his cell. Defendant (Sergeant) Casey McPartland therefore told the Plaintiff that he was going to be moving to the four-man unit (cells 23-26).

135.    Plaintiff asserts that he immediately smelled a foul odor of poop upon enter the four-man unit and that he was egregiously housed in 24 cell. It was at that exact moment that the Plaintiff remember that there used to be a mentally health incarcerated woman in the two cell (23 cell and 24 cell) on the flats (lower level of the housing unit) of the four-man unit while the said girl was under suicide surveillance, and that the said woman (whom may have had the name "McKenzie") used to play with her own feces as well as throw and rub the feces all over the Play. The said woman also had a reputation for getting naked everywhere she went even in the Courtroom. Plaintiff asserts that Deputy Ethan Perry brought some of his hygiene products were brought to him (Toothpaste and hair food) an hour and a half later but that he was still missing his Coast Bar Soap and Sauvé Deodorant.

136.    Plaintiff asserts that he attempted to get rid of the foul feces smell by cleaning, sweeping and wiping the cell walls down but that his person belong and the cell still smelled like poop. Plaintiff asserts that he wrote grievances about the unhuman living conditions which he was wrongfully being subjected to without getting any form of rational cure nor resolution. Plaintiff assert that incarcerated individual Saio Barzee (ICN No.11001866)(Plaintiff's "Power of Attorney") also wrote grievances about his cell (23 cell) smelling like feces as well. Plaintiff asserts that Defendant Casey McPartland wrongfully placed the Plaintiff in the four-man housing unit and in a feces smelling cell as a form of retaliatory treatment which deprived the plaintiff of human decency. Plaintiff asserts that the said living conditions are

atypical and significant hardship which were wrongfully inflicted upon him as a means of causing cruel and unusual punishment upon the Plaintiff for flooding his cell. Plaintiff asserts that he was maliciously subjected to the hazardous living conditions for approximately two weeks straight. Plaintiff asserts that this is a violation of his Eighth Amendment United States Constitutional rights which are applicable to the states through the Fourteenth Amendment.

137.    Plaintiff asserts that Deputy Zuk gave him a difficult time during the B Watch Shift on the 4th and 5th day of September 2024, while the Plaintiff was being housed within the Eight-man Unit (SHU-1) of the Onondaga County Justice Center. Specifically, the Plaintiff asserts that Deputy Zuk kept stating that the Plaintiff cell was not in complies because of the fact that the Plaintiff had some of his legal papers (pertaining to the HALT LAW and this present Lawsuit) neatly set on the desk. Plaintiff asserts that he therefore stopped Lieutenant Quinn and sergeant Peterson inorder to get the area supervisor to provide him with an explanation on the matter. Plaintiff asserts that both area supervisors reassured the Plaintiff that there was nothing wrong with his cell and that the Plaintiff's cell was indeed in order pertaining to the rule regulations established for incarcerated individuals being confined within the Onondaga County Justice Center.

138.    Plaintiff asserts that sergeant Peterson had even informed Deputy Zuk that the Plaintiff's cell was in compliance and for the said Deputy to not bother the Plaintiff any further on that matter. Plaintiff asserts that his housing unit was wrongfully denied of recreation three days straight during the B Watch Shift after the September 5th 2024 altercation with Deputy Zuk. Plaintiff asserts that facility simply informed the Incarcerated individuals being housed within the Protective Custody (SHU-1) housing unit that the facility was on a "lockdown". Plaintiff asserts that he is under the assumption that the "lockdown" had nothing to do with the fact that Deputy Zuk kept nagging the Plaintiff about his legal work but could be mistaken. Plaintiff asserts that he believes that the Deputy just simply tell the Protective Custody Housing Unit that they be on "lockdown" because of the fact that many of the incarcerated individuals being housed in Protective Custody are incarcerated for criminal offense in relation to sex offenses.

139.    Thereafter, Plaintiff asserts that his housing unit was allowed to have recreation during the B Watch Shift on the 8th day of September 2024. Plaintiff asserts that he had been asking the deputies to make sure that they placed him on the haircut list prior to being able to have recreation on the 8th day of September 2024. Therefore, Plaintiff asserts that, upon being released for recreation during the C Watch Shift, he personally made it his mission to make sure to respectfully ask Defendant Dasilva to call for the barber and to make sure that the Barber actually made it to the eight-man (SHU-1) Housing Unit.

140.    Plaintiff asserts that defendant Dasilva stated that he is not going to call for the barber and thus wrongfully denied the Plaintiff of the opportunity of getting his haircut (mainly getting an edge-up, and other facial grooming capabilities). Plaintiff asserts that defendant Dasilva thereafter then informed the entire housing unit, at approximately 7:30 to 8 o'clock in the afternoon of September 8th 2024, that the defendant was making a tour around the housing unit and that the said defendant will be locking in every incarcerated individual who's cell was not in compliance. Plaintiff asserts that he therefore made sure to go back to

his cell inorder to conduct a cell inspection of his own cell prior to the said Defendant making his tour. Plaintiff asserts that he first turned on the light in his cell and look around thoroughly before then turning off the light and closing his cell door. Plaintiff asserts that he went back to the table that he was sitting at, which a still close enough to the designated area established for incarcerated individuals be seated at in order to watch TV, and thus was watching the TV show other incarcerated individuals want watch.

141.    Plaintiff asserts that it was at this time that Defendant Dasilva stated that the Plaintiff had to lock in because the Plaintiff cell was alleged to have not been in compliance. Plaintiff asserts that even other incarcerated individuals had ask for what? Plaintiff,  nonetheless, went to his cell and stated that defendant Dasilva was acting like a bitch for lock him in for no justifiable reason.

142.    Plaintiff asserts that Defendant Dasilva then unprovokingly pushed the plaintiff in the back as the Plaintiff was walking into his cell. Plaintiff assert that he reached out his left arm and grabbed the doorframe of his cell door in order to prevent himself from falling. Plaintiff asserts that he simultaneously felt a sharp throbbing jolt of pain run through his left hand which naturally and quickly caused for the Plaintiff's right hand react by pushing back whatever object was causing the pain.

143.    Defendant Dasilva, unbeknown to the Plaintiff, had wantonly and unnecessarily slammed the Plaintiff's cell door on the Plaintiff's hand and the pain which the Plaintiff was feeling was a result of his hand being hit by the cell door, and thus Plaintiff's right hand was therefore pushing back the cell door. Plaintiff asserts that defendant Dasilva was then hit with the cell door. Plaintiff asserts that he immediately turned around and was holding his left hand in pain only to then notice that a figure was entering his dark and unlit cell. Plaintiff quickly realized that he was under attack and thus put his hands up in a defensive stance. Plaintiff asserts that he was simply focus on turning on his light and that he saw that the defendant was attempting to hit him with a punch to his face. Plaintiff asserts that he quickly dodged the punch and that he grabbed the defendant while the said defendant attempted to keep throwing punches at him. Plaintiff asserts that he naturally grabbed the legs of defendant Dasilva and lifted the defendant up off of the ground in order to slam him onto the ground but quickly realized that he could seriously hurt the defendant and thus therefore just simply put him back on the ground. Plaintiff asserts that he still felt punches hitting his face and head area of his body.

144.    Plaintiff asserts that he heard keys and saw Defendant Sanderson run past his cell and thus realized that defendant Dasilva must have pulled the emergency pen before attacking him. Plaintiff asserts that he quickly had a flashback to the January 7th 2024 incident where the Defendants wrongfully battered the Plaintiff while Plaintiff was handcuffed behind his back. Plaintiff asserts that be instantly became scared for his safety and knew that his health was at a serious risk as a result of being in a dark and small confined area where housing unit the facility cameras could not see into. Plaintiff asserts that he therefore then begin to rush towards the cell door while carrying defendant Dasilva with him.

145.    Plaintiff asserts that once he made it out of his cell door that he immediately jumped on the ground while defendant Dasilva still had his legs wrapped around the Plaintiff's waist and

was still maliciously throwing punches at Plaintiff unprotected face while the non-combative and non-resisting Plaintiff was laying on the ground. Plaintiff asserts that Defendant Dasilva continued to punch the plaintiff and thus the Plaintiff was attempting to move away from the punches while still not throwing any punches of his own back at defendant Dasilva.

146.    Plaintiff asserts that he remembers seeing Defendants Matthew Murphy, Randall Sanderson and defendant Marc Sarno respond to the emergency called in. Plaintiff asserts that Defendants Matthew Murphy and Randall Sanderson refused to prevent defendant Dasilva from attacking the unprotected and non-combative Plaintiff but rather instead just simply stood by and watched as excessive force was used unnecessarily. Plaintiff asserts that Defendant Dasilva continues to attack the Plaintiff for another couple of minutes before Defendant Marc Sarno finally stepped in and told Defendant Dasilva that he had to stop attacking the Plaintiff.

147.    Plaintiff was then escorted to the Special Housing Unit (SHU-3) and placed in 29 cell without any further issues. Plaintiff asserts that his "Power of Attorney" (incarcerated individual Saio Barzee (ICN No. 11001866)) who was being housed in 32 cell at the time then informed the Plaintiff that he believed that Defendant Dasilva had wrongfully intended to hurt the Plaintiff all along. Plaintiff asserts that Incarcerated individual Saio Barzee then explained of how Defendant Matthew Murphy had threatened to cause physical injuries upon the Plaintiff's Agent which therefore caused  for Saio Barzee to prematurely submit the amended complaint that he was working on so that the relevant amended papers would be stored in the District Court's docket for later use.

148.    Plaintiff asserts that it was Saio Barzee who had informed the Plaintiff to get medical assistance for his hand immediately and that the Plaintiff should continue to ask to be given the opportunity to go to the outside hospital so that the Plaintiff's injured hand could get the proper attention needed. Plaintiff asserts that Saio Barzee informed him that the doctors only have a certain about of time to properly fix fractured and broken hands and that Saio Barzee would know because he had a fractured 4th and 5th metal carpal (also known as a boxers fracture) and a fracture MCF Shaft bone near his wrist in his right hand which could have been healed immediately if the doctors would have conducted surgery when they first observed his injury.

149.    Plaintiff asserts that he was wrongfully harassed by Defendant Randall Sanderson every time the defendant worked. Plaintiff asserts that Defendant Randall Sanderson would wrongfully search his cell every time he went outside for recreation, took a shower and or any other call-out during the shift that the defendant would be working. Plaintiff also asserts that defendant Randall Sanderson would intentionally make it his priority to go to the Housing Units where the Plaintiff was working so that the plaintiff could just simply feel uncomfortable and or would avoid leaving his cell because he didn't want for his legal papers to get damaged, destroyed or taken.

150.    Plaintiff asserts that Defendant Randall Sanderson continued to harass him during the C Watch Shift on the 23rd day of September 2024. Specifically, Plaintiff asserts that Defendant Randall Sanderson intentionally continued with his "calculated harassment" tactics by

wrongfully conducting a cell search of 29 cell which was the cell that was assigned for the Plaintiff to be housed in at the time. Plaintiff asserts that the defendant maliciously threw his papers all over the place in order to force the Plaintiff to spend hours cleaning his cell back up. Plaintiff asserts that defendant Randall Sanderson then left the cuffs on his wrist after the Plaintiff started complaining about the unnecessary harassment. Plaintiff asserts that Defendant Randall Sanderson along with Defendant V. Hujdur wrongfully kept the tightly placed handcuffs on the Plaintiff's wrists for approximately twenty minutes. Plaintiff asserts that he got upset and frustrated with the continuation of harassment being wrongfully inflicted upon him by Defendant Randall Sanderson ever time the said defendant worked. Plaintiff asserts that he therefore started to attempt to spit on Defendant Randall Sanderson through the side of his cell door after the service of the dinner meals but that he could not spit on the said defendant due to the fact that the cell door prevented the spit from leaving the Plaintiff's cell.

151.    Plaintiff asserts that Defendant Dustin Saddock knew of the mistreatment and "calculated harassment" being wrongfully inflicted upon him because of the fact that the Plaintiff had personally, and repeatedly, attempted to complain about the abusive harassment and torment which was being egregiously imposed upon him. Plaintiff asserts that Defendant Dustin Saddock always responded in the same manner and that Defendant Saddock did not only not provide any form of cure or resolution but that the said defendant would also not even provide the Plaintiff (nor any other incarcerated individuals) with any grievance complaint forms.

152.    Plaintiff asserts that Defendant Dustin Saddock again provided the same ineffective assistance and was deliberate indifferent to the mistreatment imposed by stating that the Defendant didn't care about the Plaintiff's concerns and was not going to provide the Plaintiff with any form of grievances before then informing the Plaintiff that he was authorizing for the Plaintiff to be moved to the four-man unit (SHU-2). Plaintiff asserts that he declared that he initially refused to being moved to the four-man unit because of the fact that he felt unsafe around Defendant Randall Sanderson along with Defendant V. Hujdur and Dustin Saddock because of the fact that the Plaintiff knew that these two said defendants have seriously  and severely battered other incarcerated individuals before while working as Deputies within the Onondaga County Justice Center.

153.    Plaintiff asserts that Defendant Randall Sanderson implicated a hidden threat of wrongfully battering the Plaintiff again by stating that the Plaintiff better keep that same energy because Defendant Randall Sanderson was making it his priority to be the first person to enter the Plaintiff's cell if the Plaintiff makes them "suit up" (meaning that the Deputies wear protective body uniforms with a riot shield and enter the Plaintiff's cell if their initial attempt of first applying a chemical agent (Pepper spray) is not effective in getting the prisoner to comply with the order of being removed from the cell). Plaintiff asserts that he was never able to eat his dinner tray because he was too busy packing up his personal belongings.  Plaintiff asserts that he informed Defendant Dustin Saddock that he will comply with being escorted to SHU-2 and that he did not want for the Defendants to enter his cell after the Plaintiff realized that the Defendants were maliciously going to enter his cell without "suiting up" and without an EQV present as required by the rules and regulations established for staff within the Onondaga County Justice Center.

154.    Plaintiff also asserts that he informed Defendant Dustin Saddock that he was asking for the Defendants to give him the time to continue to pack up his belongings. Thereafter, Plaintiff asserts that Defendant Dustin Saddock wrongfully informed the Plaintiff that he had to leave his personal property behind during the escort from SHU-3 to SHU-2 and that the Deputies (and herein named Defendants) would bring his property to him. Plaintiff asserts that he personally informed Defendant Dustin Saddock that he was uncomfortable with having the Deputies pack up his belongings due to the fact that Plaintiff knew that Defendant Randall Sanderson was going to intentionally destroy his personal property and or that there was a high probability that the defendant would throw away some of the Plaintiff's legal papers.

155.    Plaintiff asserts that Defendant Dustin Saddock wrongfully informed the Plaintiff that he didn't care and that Plaintiff was either going to allow for the Deputies to escort his personally property to SHU-2 or that Defendant Dustin Saddock was going to do it himself and that the Plaintiff would find out of the true meaning and concept of a destroyed cell after Defendant Dustin Saddock searched his property. Plaintiff asserts that Defendant Dustin Saddock maliciously bragged about being able to damage and misplace the Plaintiff legal papers and personal property (by flushing them down the toilet) for approximately five minutes before then giving the defendants the authorization to commence with opening the Plaintiff's cell door.

156.    Plaintiff asserts that he therefore placed his hand out of the slot of his cell door and allowed for the Deputies to place mechanical restraints on his wrists. Plaintiff asserts that he remembered Defendant Randall Sanderson mocking him to other incarcerated individuals and that Defendant V. Hujdur stated "that was too easy". Plaintiff asserts that Defendant Dustin Saddock had stated he hated the fact that incarcerated individuals would complain about being mistreated while being confined within a prion environment and it is the incarcerated individuals who were the criminals that were in jail for being criminals. Plaintiff asserts that Defendant Dustin Saddock then stated "you keep violating and doing law suits we're going to see who the victim is". Plaintiff asserts that he refused to eat the tray that was left in his old cell (29 cell) because of the fact that he felt that the defendants probable would have did some unhygienic act to the food. Plaintiff asserts that Sanderson packed up his personal belongings and that he found a liquid substance on all of his legal documentations. Plaintiff asserts that his "Power of Attorney" (incarcerated individual Saio Barzee) had informed him later on that it was Defendant V. Hujdur who threw away his food in the garbage and that he personally watched Defendant Randall Sanderson remove the Gilbert and some other law books that were in the Plaintiff's property and set them on the table so that the Plaintiff could not get the said books.

157.    Plaintiff asserts that Defendant Dustin Saddock thereafter wrongfully wrote the Plaintiff an "Inmate Misbehavior Report/Hearing Notice" that alleged: **"You, with intent to expose person(s) to bodily fluid spit at a sworn staff member. With direct purpose, you exposed a staff member to saliva. Throughout the duration of the incident you made several hostile and threatening statement to physically harm a sworn staff member and their family. You reference your current criminal charges and possessing firearms during this threatening tirade."** Plaintiff asserts that the Defendants unprofessional actions was both

35

unprofessional and a constitutional violation. Plaintiff asserts that the defendants acted in a cruel and unusual manner by wrongfully retaliating against the Plaintiff for filing this 42 U.S.C. §1983 Civil Action Complaint.

158.    Plaintiff asserts that he is being wrongfully subjected to atypical and significant hardship by the said defendants refusing to remove the Plaintiff from the Special Housing Unit and that the ("OCJC") Facility has wrongfully attempted to separate the Plaintiff from his Power of Attorney (whom was moved to 26 cell as a result of being striked with a right elbow (physically assaulted) by Deputy Gerard Wagner after the Plaintiff's Power of Attorney complained about being mistreated and about the fact that the Deputies were encouraging other incarcerated individuals to verbally and physically mistreat him) so that the Plaintiff may not adequately litigate his 42 U.S.C. §1983 Complaint. Plaintiff asserts that he along with his "Power of Attorney" and Bryan Washington are the only male incarcerated individuals left housing on 5B floor of the ("OCJC") Facility for disciplinary sanctions. Plaintiff further asserts, upon information and belief, that every other male incarcerated individuals with disciplinary sanctions are being housed in 2C under living conditions that the facility is determining to meet the standards setforth for a "Step Down/RRU" Housing Unit. Plaintiff asserts that a competent person and a fair minded jurist would determine, upon sound reasoning, that the herein named Defendants are acting in a manner constituting retaliatory treatment because of the fact that the Plaintiff himself has been litigating for (see case No. 9:24-CV-0866 (GTS/DJS)) in order for incarcerated individuals to be provide with the privileges setforth under the HALT LAW and pursuant to Correction law 137. Moreover, Plaintiff asserts that other incarcerated individuals are now getting granted the same privileges which he himself had petition for and that the facility is wrongfully refusing to allow for the Plaintiff to enjoy the said privileges as retaliatory treatment for the Plaintiff petitioning to the government for a redress of grievances.

RIGHTS OF ACTION

159.    Plaintiff, proceeding pro se, complain of the defendants and asserts, upon information and belief, as follows:

COUNT ONE: CRUEL AND UNUSUAL PUNISHMENT<br>& VIOLATION OF HUMAN DECENCY<br>EIGHTH AMENDMENT CLAIM OF VIOLATION<br>FOURTEENTH AMENDMENT CLAIM OF VIOLATION

AS AND FOR THE FIRST THEORY OF THE CASE BY PLAINTIFF, NYEUQUEST<br>ALLED, AGAINST DEFENDANTS JEREMOY CORSARO

160.    It should be noted that upon discovery of legal documentations pertaining to this 42 U.S.C. §1983 lawsuit, Plaintiff was finally provided with documentations pertaining to the alleged misbehavior report filed by Defendant Jeremy Corsaro in connection to the January 7th 2024 refusal to lock in. Specifically the Incident Report alleged that:

161.    "While assigned to 5B SH-1 inmate Allen was watching the TV. Inmate Cark who was on the phone asked inmate Allen if he could watch the football game at 2030shrs. Inmate Allen began mumbling and I wasn't able to hear what he said. I asked inmate Clark if he wanted to watch the game. Inmate Allen became argumentative with me. At this time I ordered inmate a=Allen to lock and he refused and stated "you are a boozo". I then gave inmate Allen multiple orders to lock in and he refused all of them. I then ordered the pod to lock in and inmate Allen stated he was sorry and continued to sit in his chair. I told him it was too late and called a refusal to lock in over my portable radio to control. The remainder of the pod locked in and staff responded. Inmate Allen was SERT moved to 5b SH-3. 510 Lt. Lavy responded and was notified of this incident. SEE SUPPLEMENTAL.

("Supplemental Report"):

"While assigned to 5B SH-1 Inmate Allen was watching the TV. Inmate Clark who was on the phone asked inmate Allen if he could watch the football game at 2030shrs. I told him I would turn it on. Inmate Allen got upset and started he's on the phone he's not even watching TV. I informed inmate Allen that he said at 2030 hrs. And I also told inmate Allen that I turned the TV to what he wanted to watch from 1330hrs till 1800hrs. **Inmate Allen then began mumbling something under his breath so I couldn't hear him. I asked him what he said and he refused to answer me. I then stated to inmate Allen that it is the Deputy's TV and if I wished to change it I could.** Inmate Allen became argumentative with me. At this time I ordered inmate Allen to lock and he stated "you are a boozo". I then gave inmate Allen multiple orders to lock in and he refused all of them. **I then ordered the pod to lock in and inmate Allen stated he was sorry and continued to sit in his chair. I told him too late and called a refusal to lock in over my portable radio control.** The remainder of the pod locked in and staff responded. Inmate Allen was SERT moved to 5B SH-3. 510 Lt. Lavy responded and was notified of this incident.

162.    Plaintiff asserts that Defendant Jeremy Corsaro wrongfully inflicted cruel and unusual punishment upon him by maliciously preventing the Plaintiff from being able to adequately socialize and have recreation because of the fact that the said Defendant wanted to personally watch a Football game while he was at work. Plaintiff asserts that the said Defendant then wrongfully inflicted further torment and cruel and unusual punishment upon him by thereafter unprofessionally instructing the Plaintiff to go lock in so that the Defendant could just simply watch the football game. Defendant Jeremy Corsaro's actions are against the rules and regulations established by the New York State Minimum Standards and Regulations, The Onondaga County Sheriff's Office Employee Rights and policies authorized by the Onondaga County Sheriff's Office.

163.    Plaintiff further asserts that Defendant Jeremy Corsaro's actions thereafter triggered serious and severe injuries upon the Plaintiff. Therefore, Plaintiff asserts that a competent person and a fair minded jurist would determine, upon sound reason, that Defendant Jeremy Corsaro's tortful behavior violated Plaintiff Eighth Amendment United Stated Constitutional Right of being free from cruel and unusual punishment. Plaintiff asserts that the Eighth Amendment right is applicable to the states through the Fourteenth Amendment of the United States Constitution.

164.    Furthermore, Plaintiff asserts that Defendant Jeremy Corsaro's misbehavior report is a clear indication of substantial and prima facie evidence which shows of how blatantly the Defendant abused the authority given to him. In this case, the defendant specifically used language which supports that facts raised in this Pleading by the Plaintiff.

165.    Specifically, Defendant report that: **"While assigned to 5B SH-1 Inmate Allen was watching the TV. Inmate Clark who was on the phone asked inmate Allen if he could watch the football game at 2030shrs. I told him I would turn it on. Inmate Allen got upset and started he's on the phone he's not even watching TV."** Plaintiff asserts that these sentences show that the Plaintiff was right in declaring that the Defendant wrongfully was refusing to allow for Plaintiff to switch the channel to TV Station that the Plaintiff wanted to watch and rather instead wrote a misbehavior report which fabricated allegation that portrayed the image as if Incarcerated individual Kevin Clark was the reason for why the defendant to did not change the station. Plaintiff asserts that his arguments are supported by the fact that the Defendant acknowledged that the Plaintiff was the only Incarcerated individual watching the TV.

166.    Furthermore, Plaintiff asserts that his arguments are also supported by the fact that Defendant Jeremy Corsaro stated that: "I informed inmate Allen that he said at 2030 hrs. And I also told inmate Allen that I turned the TV to what he wanted to watch from 1330hrs till 1800hrs. **Inmate Allen then began mumbling something under his breath so I couldn't hear him. I asked him what he said and he refused to answer me. I then stated to inmate Allen that it is the Deputy's TV and if I wished to change it I could."** Plaintiff assert that the personalization of the TV and the language which Defendant Corsaro uses show that the Defendant Wrongfully abused his authority so that he could continue to watch the football game.

167.    Additionally, Plaintiff asserts that being confined to the special housing unit is supposed to be the last resort remedy if an incident and or altercation could not be properly cure. Plaintiff asserts that Defendant Corsaro's Incident report indicated that the plaintiff still attempted to use rational reasoning in getting a resolution and from escalating the situation even though the Plaintiff was in the right and knew that defendant Corsaro was simply inflicting cruel and unusual punishment upon him. Plaintiff shines a light on the fact that the Incident report documented that: "Inmate Allen became argumentative with me. At this time I ordered inmate Allen to lock in and  stated "you are a boozo". I then gave Inmate Allen multiple order to lock in and he refused all of them. **I then ordered the pod to lock in and inmate all stated he was sorry and continued to sit in his chair. I told him too late and called a refusal to lock in over my portable radio control."**  And thus that Plaintiff attempted to defuse the situation as asserted in this Pleading and even thereafter stated sorry which the Defendant himself acknowledges within his report. Plaintiff asserts that the Defendant's malicious intention is presented by the defendant cruelly stating that "**I told him too late and called a refusal to lock in over my portable radio control**" after the Plaintiff had said sorry.

168.    Plaintiff also asserts that he is entitle to Procedural Due Process and of Liberty even within the context of a prison type environment. Plaintiff asserts that defendant Jeremy Corsaro violated Plaintiff's Fourteenth Amendment right by wrongfully confining the Plaintiff to the Special Housing Unit and maliciously subjected the Plaintiff to atypical and significant hardship living condition by fabricating facts within the report filed by the defendant. Plaintiff thereafter also asserts that Defendant Jeremy Corsaro violated the Plaintiff's Due Process rights wrongfully by not presenting a misbehavior report to the defendant which claimed of facts that show of the rule violation alleged by the defendant, and thus also violated the Plaintiff right of human decency.

169.    Wherefore, Plaintiff asserts that the information presented in this Amended and supplemented Complaint plausibly plead of facts which demonstrates that Defendant Jeremey Corsaro wrongfully and unconstitutionally violated Plaintiff right of being free from Cruel and Unusual Punishment as setforth by the Eighth and Fourteenth Amendment of the United States Constitution.

COUNT TWO: EXCESSIVE USE OF FORCE
CRUEL AND UNUSUAL PUNISHMENT
& VIOLATION OF HUMAN DECENCY
EIGHTH AMENDMENT CLAIM OF VIOLATION
FOURTEENTH AMENDMENT CLAIM OF VIOLATION

AS AND FOR THE SECOND THEORY OF THE CASE BY PLAINTIFF, NYEUQUEST
ALLEN, AGAINST DEFENDANTS RANDALL SANDERSON, MATTHEW MURPHY,
JOSEPH LEE, JONATHAN HAGENMAYER AND  ALTON APPPLES

170.    At all times relevant to this action, the Defendants are, and remain, as peace officers (deputies) employed by the Onondaga County Sheriff's Office ("OCSO") pursuant to CPL §1.20 (33). The Defendants, on Sunday the 7th day of January 2024, were working as deputies at the Onondaga County Justice Center ("OCJC") which resides at 555 South State Street, Syracuse, New York 13202-2104. IT should also be noted that the defendants were present and working at Onondaga County Justice Center ("OCJC") while the Plaintiff, a pretrial detainee, was being confined at the said local correction facility.

171.    Plaintiff asserts, upon information and belief, that Defendant Randall Sanderson, Alton Apples, Matthew Murphy, Jonathan Hagenmayer, Joseph Lee and Daniel Lavy were the Deputies that responded to the Emergency Response called in for a refusal to lock in on the "eight man" unit (SHU-1) by defendant Jeremy Corsaro on Sunday the 7th day of January 2024 at approximately 19:57:56 pm. Plaintiff asserts upon belief that sergeant Keeney had responded thereafter and thus was present in SHU-3 when the Plaintiff was wrongfully battered by Defendants Randall Sanderson, Alton Apples, Matthew Murphy, Jonathan Hagenmayer and Joseph Lee. Plaintiff asserts that neither Defendant Sergeant Keeney nor Defendant Lieutenant provided any type of cure to the injuries suffered wrongfully by the Plaintiff and that the Both said defendant had the authority and power to stop the tort but neglected to do so.

172.    It should be noted that upon discovery of legal documentations pertaining to this 42 U.S.C. §1983 lawsuit, Plaintiff was finally provided with documentations pertaining to the alleged misbehavior report filed by the Defendants in connection to the January 7th 2024 excessive use of force. Specifically, Plaintiff asserts that the Internal Affair's Investigation Reports (see case file No. 24-072) stand as substantial and credible proof of the defendants prior statements which evidentially shows that the defendants' argument are conclusory, contradictory and not sound based.

173.    First, Plaintiff highlight the fact that page 21 of the report states that:

"19:56:57 – Deputies Sanderson and murphy enter the Pod, immediately followed by Lt. Lavy, and order inmate Allen to get on the ground. At this point, Inmate Allen is standing, with both of his hands to the side, and does not get on the Ground as ordered.
19:56:58 – Deputies Sanderson ad Murphy ground inmate Allen in what appears to be controlled motion and are able to handcuff inmate Allen. It does not appear that inmate Allen is resisting at this point.
19:57:44 -- Dep. Apples enters the pod and positions himself by inmate Allen's legs.
19:57:59 – Dep. Lee enters the Pod and also position himself by inmate Allen's legs. Other member of service enter the Pod but leave soon after.
19:58:24 – Deputies Murphy and Sanderson stand inmate Allen up. Inmate Allen can be heard complaining about his arm, but it appears that he is holding his right forearm with his left hand, as described in Dep. Lee's report. Dep. Lee can be heard telling inmate Allen to let go of his hand, but he does not.

174.    This District Court should note that Defendant Matthew Murphy provided a Supplemented Report of the Incident that occurred on the 7th day of January 2024 and which thereafter also confirms that the Plaintiff had indeed notified the Defendants and other responding Deputies of his medical issues. Specifically, Matthew Murphy reported that:

"On the above date and time while working as the 5B2 Deputy I responded to 5BSH1 after hearing a refusal to lock in called over my portable radio. I entered the unit and observed an inmate who was later identified as Allen, ,Nyquest 1500405 standing in the day area of the pod. **Inmate Allen was given multiple orders to get onto the ground which he failed to comply with. Inmate Allen had his hand in the air when myself and other staff made contact with him.** I secured inmate Allens arm into an arm bar and ordered him to the ground. I then used the arm bar to secure inmate Allen onto the ground and laced his hands behind his back where handcuffs were applied. **While secured on the ground waiting for more staff to respond inmate Allen was complaining that he cant be on the ground and that he had bullets in his body.** Once more staff arrived it was determined that inmate Allen would be moved to SH3.

175.    It should also be noted that Plaintiff's pleading adequately demonstrated that the Plaintiff was not actually attempting to be resistant but rather instead simply just had a difficult time getting down on the ground due to the fact that he has extreme back pain. Plaintiff asserts that he was truly supposed to have been housed on the Flat (lower levels of every housing Unit) and that he has a flats order in place presently for that same said specific issue. Furthermore,

Plaintiff asserts that Page 29 of 35 of the Investigation Report (under case number 24-072) filed by Defendant R. Dobrowolski states that Defendant Randall Sanderson believed that the Plaintiff was not actually attempting to be combative nor resistive but rather instead complied and that there stood a feasible probability that the Plaintiff did not get down on the ground due to the fact that the Plaintiff suffered extreme pain as a result of his medical issues. Specifically, the Report stated that:

**"Dep. Sanderson added that Allen was not resisting and as soon as they got a hold of him, he went down to the ground without any resistance, and Dep. Sanderson was able to apply handcuffs without any issues."**

176.    Plaintiff further states that Defendant Joseph Lee's statement reveals that the Plaintiff did actually indeed give the Defendants notice that the handcuffs were place too tight on his wrist and that the pain was evidentially causing his extreme pain. Specifically, Plaintiff asserts that page 12 of 13 (under case No.24-072 of the Investigation report file by Defendant R. Dobrowolski) reveals that Defendant Joseph Lee stated that:

"Dep. Lee responded to a call for a refusal to lock in on pod 5B special housing 1. Upon arrival, Dep. Lee found inmate face down on the floor by the stairs and the door to special housing 1 with his head facing toward the door and his hands handcuffed behind his back. Dep. Lee knelt next to his left leg. The Inmate was identified as Nyquest Allen.

Inmate Allen stated he would walk compliantly to special housing 3. He was then brought to his feet and began to walk on his own with staff escorting. **As he was being escorted, he began to complain that his wrist was in pain due to the handcuffs. He was grabbing his right forearm with his left hand. Dep. Lee told him to let go to fix it, but he refused Dep. Lee's direction.**

Inmate Allen was then brought into 39 cell in pod 5B special housing 3. He was laid down on the mattress face down with his head facing the back of the cell. Dep. Lee stayed outside the cell door because inmate Allen was complying while the escorting staff began to remove the handcuffs. **Inmate Allen was still complaining of his wrist being uncomfortable.**"

177.    Plaintiff asserts that he highlighted these facts for the Court in order to show that a competent person and a fair minded jurist would determine, upon sound reasoning, that the reported allegations claimed by the defendants actually stand a supportive backbone to the facts asserted in the amended and supplemented pleading being brought forth by the Plaintiff herein and thus also provide substantial proof that the Plaintiff has so far plead of facts that plausibly demonstrate that he is entitled to the claims which he has asserted under the United states Constitution. Plaintiff now takes the time to show of how the defendants provided contradictory statements within their own investigation reports in connections to the actions that the defendant took during the removal of the handcuffs and which is the basis that the defendants are premising their entire defense around.

178.    specifically, Plaintiff asserts that Defendant Randall Sanderson submitted supplemental reported that stated:

"On the above date I responded to a refusal to lock in called in Pod 5B SSH1. **I entered the Pod and observed Inmate Allen, Nyequest (15000405) standing just inside the door with his hands in the air.** The inmate refused orders to get on the ground. I took control of the inmates left wrist as Deputy Murphy took the inmates right wrist as we secured him to the ground, **I Applied handcuffs and waited for additional staff.** The decision was made to move inmate Allen to 5B SH3 for an on the fly move. Deputy Murphy remained in the S1 position while I remained in the S2 position as we walked the inmate over to 5B SH3 cell 39. We entered the cell and inmate was given clear instructions to kneel down on the mattress while was lowered to the mattress. **I remained in control of the inmates left upper torso and wrist as the team leader began to remove the handcuffs.** The inmate was given clear instructions to place his arm to his side once the left hand cuff was removed. The inmate simultaneously stated "Now I'm gonna make you work!" while pulling his left wrist away from his side and struggling to pull away from staff. The Inmate also stated during this struggle "Now you motherfuckers are gonna have to beat my ass!" The Inmate was attempting to pull his arm under his body. **I delivered several knee strikes to the left upper arm giving loud commands to give me his arm.** The Inmate did give up his left arm after delivering the strikes and his wrist was able to be secured in the handcuffs. **With additional staff now in the cell** I remained in the S2 position maintaining control of the inmates left wrist and upper torso. I assisted the team leader while he cut the inmates shirt off. The other members of the team were given there individual orders. S3 had the inmate in a figure four leg lock and as the handcuffs were removed each wrist was transferred to S3 to maintain control. The team leader verified all remember were secure and instructed members to exist the cell. I then pulled S3 from the cell utilizing a tactical exist. I pulled S3 from the cell due to a pre existing injury that S1 currently has. The door was secured. Nurse Susan Sheridan arrived to assess the inmate. The inmate was instructed to back up towards the door so that handcuffs could be applied. Once the handcuffs were secured the inmate was given instructions to sit on his bed. The Inmate made several statements "Now I'm gonna get my million dollars!" " Take these Cuffs off and lets do this shit!" "I dont care if I get life, I'm done on the 30th and gonna get one of you!" Wait til this door opens again and I'm gonna get the first one that opens my door!" These were just a few of the Many threats this inmate made to the on the scene staff. Nurse Sheridan stated that the inmate was okay and his vital signs were within normal permitters. The inmate then backed up to the door where I removed the handcuffs and secure the meal slot. End of Report."

179.    plaintiff assert that Defendant Alton Apples also filed a supplemental report which alleged that:

"On the above date and time I responded to a refusal to lock in called via portable radio in 5BSH1. Upon arriving I observed SERT staff restraining an inmate on the ground who was identified as Allen, Nyquest (15000405). I maintained control of Allen's right leg until

additional staff arrived on the unit. Once additional staff arrived, the Watch Commander determined that Allen would be moved to 5BSH3. Inmate Allen stated that he would comply walking over to 5BSH3 and was stood up on his feet and escorted to the unit. Inmate Allen was walked over to cell 39 where he was walked in and placed on the ground in a prone position onto a mattress. **Staff had control of both arms while another Sert staff member began to remove the handcuffs. Once the left cuff was removed, Inmate Allen stated "You know what I'm going to make ya'll work now"** and began to flail his body and pulled his left arm away from staff. **I immediately positioned myself at his head and maintained head control while giving order to stop moving and place his hands behind his back.**

Allen failed to follow any orders from staff and continued to flail his body and would not place his hand behind his back. **Staff maintained control of the left arm and the left handcuff was secured again**. An on the fly SERT move was activated for a tactical exist from the cell. I was placed as Team Leader and my team consisted of the following;

Team Leader: Deputy Apples
S1: Deputy Murphy
S2: Deputy Sanderson
S3: Deputy Lee
S4: Deputy Hagenmayer
EQV: Deputy Philips

At this time I directed S3 and S4 to remove the clothing from inmate Allen's lower portion of his body and secure his legs to the ground once complete. S1 and S2 assisted me with cutting off the clothing from his upper body. Once complete, **I directed S3** to place inmate Allen into a figure four leg lock while S4 removed the handcuffs. Once S3 had full control of his body, myself, S2 and S4 existed the cell and S1 and S3 executed a tactical exist and the door was secure without incident. Nurse Susan Sheridan Responded to evaluate inmate Allen and deemed no further medical attention was needed. There is nothing further to add."

180.    Plaintiff asserts that defendant Alton Apples contradicted both himself and the other statements reports filed by the other Defendants. Plaintiff asserts that page 18 of 35 and 19 of 35 both reveal that the Defendant continues to blatantly lie about the true nature of his actual involvement in the January 7th 2024 incident. Plaintiff highlights the fact that Defendant Alton Apples stated:

(Page 18 of 39): **"Dep. Apples noted that Allen was displaying Active resistance, and that he gave verbal direction during his response to resistance and aside from threatening the use of empty hand-soft technique, Dep. Apples, as a SERT Team leader, did not utilize any."**

(Meanwhile, Page 19 of 35): "Sgt. Sarno wrote that **the reason Dep. Apples applied force** was to deal with an inmate who became combative, once restraints were removed. According to Sgt. Sarno, neither Dep. Apples nor the inmate were injured in the incident."

181.    However, this court should note that Page 32 of 35 of the Investigation reported conducted by Defendant R. Dobrowolski revealed that Defendant Alton Apples stated that:

**"Dep. Apples stated that he was the team leader for Allen's initial complaint move to SH3.** Upon arriving inside the cell, Allen first kneeled and then he was aid down on the mattress. Dep. Apples stated that besides him, involved in the escort were Deputies Murphy, Sanderson, Lee, and Hagenmayer.

Once he was laid down, Dep. Apples heard Allen Make a statement, ***"when you take these cuffs off, I'm gonna make you work."* Dep. Apples furthered that as Dep. Hagenmayer removed one cuff off Allen, that was when he used that free arm in an attempt to get up.** In Dep. Apples professional opinion, Allen was attempting to get up so that he would be in a better position to fight the Deputies inside the cell but was unsuccessful.

**Dep. Apples stated that he was at Allen's head,** and from the position he was in, **he clearly observed that Allen attempted to strike Dep. Murphy.** Dep. Apples elaborated that **he conducted a simple headpin and did not deliver any strikes to Allen.** Since Dep. Apples was **concentrating on his assignment, he did not have an opportunity to observe if any of the other Deputies deliver any strikes to Allen."**

182.    Plaintiff asserts that a competent person and a fair minded jurist would determine, upon sound reasoning, that these two fact have already evidentially and clearly shown that there is a contradiction of who was the defendant who removed the handcuffs from the Plaintiff's wrists. Moreover, the Plaintiff asserts the investigation Reports further shows of contradictory evidence pertaining to the handcuffs. Specifically, Plaintiff asserts that Defendant Alton Apples stated that:

Page 13 of 35 (Case No. 24-072, filed by Defendant R. Dobrowolski):

**"Once the left cuff was removed,** Inmate **Allen stated, "You know what I'm going to make ya'll work now"** and began to flail his body and would not place his body and pulled his left arm away from staff."

183.    Meanwhile, Plaintiff asserts that Defendant Jonathan Hagenmayer submitted a Supplemental Report which stated that:

"While assigned to booking. I responded to pod 5BSH1 for a refusal to lock in. Upon my arrival, sworn staff had Nyquest Allen 15-0405 secured in handcuffs. Numerous supervisors were present and it was determined to escort Nyquest Allen to pod 5BSH3. Nyquest Allen walked compliantly to 5BSH3 and was escorted into cell 39. A mattress was laid on the cell floor for Nyquest Allen to kneel on and be guided to the floor. **I removed the handcuff from Nyquest Allen left wrist and ordered him to place it to his side, he complied. While attempting to remove the handcuff from Nyquest Allen right wrist, I heard Nyquest Allen make a muffled comment about a fight and tried to pull his hands over his body. I was able to keep the loose handcuffs tightly gripped in my left hand and prevent Nyquest Allen from breaking free to use the handcuffs as a weapon.** Numerous orders

were given for Nyquest Allen to place his hands behind his back. Nyquest Allen refused. **I utilized a shin pin to Nyquest Allen's upper legs**, however, **all my attention was directed at making sure I maintained control of the loose handcuff.** Deputy **Sanderson was able to force Nyquest Allen left arm behind his back and I secured it in the loose handcuff.** Due to Nyequest Allen escalating the move, I was now in position and assumed the role of S-4 for on-the-0fly Sheriffs Emergency Response Team (SERT) move.

I assisted with removing Nyquest Allen pants and underwear. At the direction of the team leader. I removed the handcuffs from Nyquest Allen once he was secured in a figure four leg lock by S-3. I existed the cell and maintained control of the door. A tactical exist was utilized and the cell door was secured without incident."

184.    Plaintiff asserts that page 31 of 35 (case No.24-072, filed by Defendant R. Dobrowolski) provided further evidence of corruption and inconsistence of fact by the defendants. Specifically, Johnathan Hagenmayer reported that:

"Once inside the cell, Allen was laid down on the mattress. Dep. Hagenmayer was on Allen's left side and stated that Allen appeared to be cooperative. Dep. Hagenmayer took one cuff off Allen's left wrist and told him to lay it by his side. **Dep. Hagenmayer remembered that as he was taking the left cuff off, Allen mumbled something, and the only word Dep. Hagenmayer remembered hearing clearly was the word "fight."**

At this point, Allen began resisting and he was trying to rip both of his arms and place them under his body. **Dep. Hagenmayer stated that Allen was only able to do that with his left hand because Dep. Hagenmayer held onto the right hand, which was still cuffed so that Allen could not use the strands as a weapon.**

**Dep. Hagenmayer elaborated that Allen was not able to accomplish much because of all the Members of Service who were there. Dep. Hagenmayer added that he was trying to hold his (Dep. Hagenmayer's) weight on Allen so that he could continue to hold onto the cuffed hand, which Allen attempted to rip out of Dep. Hagenmayer's grip.**

Dep. Hagenmayer stated that Allen was not compliant, but he could not see what actions he was performing exactly and if he was trying to strike any of the Deputies. According to Dep. Hagenmayer, the fight did not last long, a matter of seconds, before Dep. Hagenmayer was able to re-cuff Allen."

185.    Plaintiff asserts that Defendant Joseph Lee then provided a contradictory statement which showed that the defendants actions were unjustifiable and that excessive amount of force was wrongfully inflicted upon the Plaintiff in a wantonly and unnecessarily cruel and unusual manner. Specifically, Plaintiff highlight that Page 12 of 35 (Case No. 24-072) of the Investigation report filed by Defendant R. Dobrowolski stated that:

"Inmate Allen was then brought into cell 39 in pod 5b special housing 3. He was laid down on the mattress face down with his head facing the back of the cell. **Dep. Lee stayed outside the cell door because inmate Allen was complying while the escorting staff began to remove the**

**handcuffs. Inmate Allen was still complaining of his wrist being uncomfortable. The handcuff from the left wrist was removed and placed at the inmate's side.** As the right wrist was being removed, Dep. Lee heard inmate Allen state "now I' gonna make you work". It was at this time Dep. Lee saw him begin to struggle and attempt to get up. **Dep. Lee then entered the cell, crossed his right ankle over his left ankle and secured both feet to the floor.** The staff in the cell attempting to put inmate Allen back in handcuffs but was having difficult time getting his hands behind his back. The team did get the hands handcuffed behind his back after struggling with inmate Allen.

At this time, Dep. Lee became S 3 and assisted with the removal of inmate Allen's pants and underwear. The team leader cut inmate Allen's t-shirt and removed inmate shirt off him with the assistance of S 1 and 2. Once the shirts were removed from inmate Allen, Dep. Lee placed him in a figure four and took control of his wrists and hands. The handcuffs were removed by S 4. Dep. Lee was then pulled out of the cell as he let go of inmate Allen's hands performing a tactical exist. The door was then secured."

186.    Plaintiff asserts that Defendant Matthew Murphy provided a statement which contradicts the nature of the actions committed by the Defendants and which also bring more proof that a competent person and a fair minded jurist would determine that the said defendants acted in a malicious and unnecessary manner. First, the Plaintiff points to the fact that Defendant Matthew Murphy wrote a Supplemental Report of what occurred during the January 7th 2024 incident and which stated that:

"On the above date and time while working as the 5B2. Deputy I responded to 5BSh1 after hearing a refusal to lock in called over my portable radio. I entered the unit and observed an inmate who was later identified as Allen, ,Nyquest 15000405 standing in the day area of the pod. Inmate Allen was given multiple orders to get onto the ground which he failed to comply with. Inmate Allen had his hands in the air when myself and other staff made contact with him. I secured inmate Allens right arm into an arm bar and ordered him to the ground. I then used the arm bar to secure inmate Allen onto the ground and laced his hands behind his back where handcuffs were applied. While secured on the ground waiting for more staff to respond inmate Allen was complaining that he cant be on the ground and that he had bullets in his body. Once more staff arrived it was determined that inmate Allen would be moved to SH3.
    Inmate Allen stated he would walk and would comply with orders. Due to this he was stood up and walked from SH1 into Sh3 cell 39. Myself (S1) and S2 helped inmate Allen kneel onto the mattress laying on the floor of the cell. **Inmate Allen was complaining of the handcuffs being too tight** and was becoming more agitated. Inmate Allen demanded that the handcuffs be removed now and as I was explaining to him that we were trying to remove them he stated "now I'm Gonna make you guys work" and "I'm gonna make you fuckers beat my ass now"
    **At that moment the left handcuff was being removed and inmate Allen pulled his left arm away and began to struggle. I was fighting for control of his right arm which was still handcuffed at this time. I utilized closed fist strikes to the meaty part of the inmate right arm and his radial nerve to stop him from flailing the handcuffs around.** Inmate Allen was actively struggling with staff and **was flailing his head and upper body around in attempts to get free.** More staff entered the cell and helped to secure the inmate. The inmates left arm was finally secured again in hand cuffs.

I then assisted the team leader in cutting the inmates uniform shirt off using an issued SERT rescue Knife. I then secured the inmates right arm while the inmate was placed in a figure four and the handcuffs were removed. A tactical exist was then performed and the door was secured. Medical was called to asses inmate Allen and responded to the unit. While the nurse was getting ready to examine inmate Allen he was yelling out of his cell door at deputies saying "next time this door opens I am knocking out the next deputy." Due to his threats the inmate was handcuffed behind his back and a camera was used to record the assessment. **While in the cell with the nurse the inmate told us** "he cant wait to get his million dollar lawsuit" **that he feels threatened by having the deputies in the cell and only wants the nurse to be in there**. He then stated "he get out on the 30th and if he sees one of us he will kill us. That he doesn't care about his daughter and he will do life in prison to kill one of us." After the **nurses** were done with assessment we existed the cell and secured the door. The **nurses** informed us the inmate need no further medical attention."

187.    Plaintiff asserts that the Defendants even thereafter wrongfully claimed that the Plaintiff was in possession of a weapon during the January 7th 2024 incident. Plaintiff asserts that Defendants Jonathan Hagenmayer and Defendants Matthew Murphy maliciously attempted to cover up for their unprofessional actions by claiming that they used force because they claimed to have saw the Plaintiff Possess a weapon. Specifically, Plaintiff highlights that the Investigation report filed by Defendant R. Dobrowolski states that:

(Page 15 of 35)

**"Dep. Murphy noted that Allen** was displaying Active and Combative Resistance, **was Actually Armed**, and was a physical threat/Attack on member or another. Dep. Murphy did not note why the Subject Management/Control was necessary."

(Page 19-20 of 35)

"Dep. Hagenmayer noted that Allen was displaying Active and Combative Resistance, was a Physical Threat/Attack on member or another, **was actually armed, with location of his weapon *"in hand"* and that Allen was *"hitting head"*. Dep. Hagenmayer furthered that the subject management/control was necessary to defend self, defend another, restrain for subject's safety and accomplish official purpose: place in handcuffs."**

188.    Plaintiff asserts that Defendant Joseph Lee reported that he used force which caused injuries upon the defenseless Plaintiff. Specifically, Plaintiff highlights the fact that Page 17 of 35 states that:

**"Dep. Lee wrote that that he gave verbal direction during his response to resistance and utilized empty hand-soft technique, which resulted in swelling/contusions to Allen and no injuries to Dep. Lee."**

189.    Plaintiff asserts that the herein named defendants acted in a manner that clearly violated the constitutional rights guaranteed to the Plaintiff and thereafter also caused the Plaintiff to suffer from a permanent lifetime physical disability which will forever affect his daily

activities and functioning. Plaintiff asserts that the defendants did not act in a good-faith manner to uphold the integrity and interest of the facility but rather instead wrongfully used excessive force wantonly and unnecessarily upon the non-combative, non-resisting, non-armed, and defenseless Plaintiff whom was already laying on the ground and incapable of moving at the rapid speed being asserted by the defendants as a result of suffering from a prior injury to his spinal cord.

190.    Plaintiff asserts that the Defendants had no justification nor probable cause to inflicted such cruel and unusual punishment upon him. Plaintiff asserts that the contradictory of statements provided by the defendants stands as credible proof which supports the Plaintiff's pleading that the batterment was maliciously inflicted as cruel and unusual punishment.

### AS AND FOR THE THIRD THEORY OF THE CASE BY PLAINTIFF, NYEUQUEST ALLEN, AGAINST DEFENDANT DASILVA

191.    Plaintiff asserts that Defendant Dasilva must be liable for using excessive force which wrongfully caused the Plaintiff to suffer a left hand injury. Plaintiff asserts that the Defendant was not supposed and is not authorized to throw unnecessary punches at incarcerated individuals unless as a form of self-defense. In this case, Plaintiff asserts that the defendant acted in a manner which a competent person and a fair minded jurist would determine was both unprofessional and illegal. Specifically, Plaintiff highlights the fact that the defendant wrongfully pushed the Plaintiff roughly on his back as the Plaintiff was entering his cell. Plaintiff asserts that the defendant culpable mind state was evident from the fact that the Defendant then quickly attempted to slam the door shut. Plaintiff asserts that the defendant further showed a culpable mind stated by then wrongfully entering the Plaintiff's cell while the plaintiff was in the dark cell holding his hand in agony. Plaintiff asserts that the Defendant then wrongfully attempted to punch the Plaintiff and that the defendants actions were wantonly and unnecessary inflicted with the intent of causing the Plaintiff injuries and were also committed under the egregious understanding that the Housing Unit camera could not adequately see inside of the Plaintiff's cell.

192.    Additionally, the Plaintiff asserts that the defendant thereafter blatantly continued to attack the non-combative and non-resisting Plaintiff as the Plaintiff was laying on the floor outside of the cell after the Plaintiff had to carry the defendant out of his cell so that the responding Deputies didn't severely hurt him again like they did during the January 7th 2024 SERT move. Plaintiff asserts that Defendant Dasilva acted as a "Conduit" and or agent on the behalf of Defendant Matthew Murphy and Randall Sanderson. Plaintiff asserts this fact after highlighting the fact that the Plaintiff's Power of Attorney had been wrongfully threatened earlier by Defendant Matthew Murphy while being escorted to the law library. Plaintiff assets that Defendant Matthew Murphy threat must not be considered a de minimums factor in supporting his argument due to the fact that it is a well-known fact that the Plaintiff's "Power of Attorney" has been working on the Plaintiff case for a while and had been helping Plaintiff with his legal papers. Plaintiff asserts that his argument is further supported by the fact that it was Defendant Randall Sanderson and Matthew Murphy whom were the first Deputies to respond to the incident and because of the fact that they intentionally refused to

intervene and stop Defendant Dasilva from continue to wrongfully attack the Plaintiff while the Plaintiff was laying on the ground.

193.    Plaintiff asserts that the circumstance combined as a whole make Defendant Dasilva's actions cruel and unusual and also thereafter stand as a form of retaliatory treatment inflicted upon the Plaintiff as punishment for the Plaintiff petitioning to the government for a redress of grievances.

COUNT THREE: DELIBERATE INDIFFERENCE
CRUEL AND UNUSUAL PUNISHMENT
EIGHTH AMENDMENT VIOLATION
FOURTEENTH AMENDMENT VIOLATION

AS AND FOR THE FOURTH THEORY OF THE CASE BY PLAINTIFF, NYEUQUEST
ALLED, AGAINST DEFENDANTS CONNER (BADGE NO.4197)

194.    Plaintiff asserts that defendant Conner must be held liable for being deliberate indifferent to the cruel and unusual punishment wrongfully inflicted upon the Plaintiff. In this case, Plaintiff asserts that his safety was jeopardized as a result of Defendant Conner giving confidential information pertaining to the Plaintiff to other incarcerated individual housed within the General Housing Unit. It should be noted that General Housing is a Unit designated for incarcerated individuals who have either been placed there as a result of misbehaving and or who were first housing in the Special Housing Unit and then released to the General Housing unit as a result of not getting in trouble within the timeframe stabled by correction law 137; and thus a competent person and a fair minded jurist would determine that the General Housing Unit is where the misbehaved incarcerated individuals are.

195.    Plaintiff asserts that Defendant Conner's action must be viewed from a light which reasonably highlights of the potential threat imposed upon the wellbeing and safety of the Plaintiff. In this case, Plaintiff asserts that incarcerated individuals whom had issues with the Plaintiff immediately started calling the Plaintiff a "rat" and or a "snitch". Plaintiff asserts that he lost the ability to adequately socialize with other incarcerated individuals within the local correctional facility and that the rumors of the Plaintiff being a potential "rat" and or "snitch" have reached regular society and thus have placed the Plaintiff in even further danger. Plaintiff asserts that it was Defendant Conner's responsibility to not only NOT DISCLOSE of such personal and confidential information but that it was the defendants responsibility to thereafter also make sure to have cured the mistake which had wrongfully inflicted upon the Plaintiff.

196.    Plaintiff asserts that the local correctional facility also thereafter then place the Plaintiff back into general population around the same incarcerated individuals whom had just been provided with the said information and thus was wrongfully further subjected to dealing with rumors and abusive torment from other incarcerated individuals. Plaintiff asserts that he was then maliciously subjected to further cruel and unusual punishment by the local correctional facility then wrongfully notifying him that the said facility intended to move him to the housing unit which the Plaintiff did not want to be housed in and which was where the

incarcerated individuals whom have caused his severe physical bodily harm (gunshot wounds) were being housed.

197.    Plaintiff asserts that this actions are against the standards setforth under Eight Amendment Clause of the United States Constitution and is a clear violation of human decency. Plaintiff asserts that Defendant Conner acted deliberate indifferent to his safety and thus he was compelled to fight another incarcerated individual simply so that he could attempt to uphold the image that he was not to be pushed over and bullied by other incarcerated individuals. Plaintiff asserts that he suffered time in the Special Housing Unit and minor physical cut and bruises as a result of the wrongful action committed by Defendant Conner and the other John Doe Deputies working within the General Housing Unit.

COUNT FOUR: DELIBERATE INDIFFERENCE
CRUEL AND UNUSUAL PUNISHMENT
EIGHTH AMENDMENT VIOLATION
FOURTEENTH AMENDMENT VIOLATION

AS AND FOR THE FIFTH THEORY OF THE CASE BY PLAINTIFF, NYEQUEST
ALLEN, AGAINST DEFENDANTS DANIEL LAVY, PHILIP AND SERGEANT KEENEY

198.    Plaintiff asserts that defendant Daniel Lavy along with Defendants Philip and sergeant Keeney must be held liable for being deliberate indifferent to the cruel and unusual punishment wrongfully inflicted upon the Plaintiff when the defendant wantonly and unnecessarily used excessive force upon the non-combative and defenseless Plaintiff.

199.    Plaintiff asserts that Defendant Daniel Lavy was the superior Deputy present during the January 7th 2024 incident and thus had the authority and responsibility to prevent the defendants from wrongfully battering the Plaintiff but neglected to do so. Plaintiff asserts that Defendant Lavy had plenty of time to provide cure during the time of the batterment but chose not to intervene as require by law. Plaintiff asserts that the culpable state of mind of Defendant Lavy was revealed in the Investigation Report filed by Defendant R. Dobrowolski.

(Page 27 of 35)

"Lt. Lavy stated that on the day of the incident, he responded to Allen's refusal to lock in. He furthered that upon his arrival, Allen was standing and was refusing directions to get on the ground. **Lt. Lavy added that he believed that the first Deputies on the scene were Dep. Murphy and Dep. Apples, who grounded and handcuffed Allen.**

Lt. Lavy stated that Allen was then stood up and walked over to SH3, where he was placed in a single cell. Lt. Lavy furthered that once inside the cell, Allen stated to the Deputies, "now, I'm going to make you work." As the Deputies were trying to remove Allen's restraints, he became resistive. **Lt. Lavy stated that he could not really describe Allen's resistive actions, as there were numerous Deputies in the cell and his view of Allen was obstructed by their bodies.** Lt Lavy added that e**ventually** Allen was handcuffed, placed in a figure four, and a tactical exist was performed. According to Lt. Lavy, Allen came up right to the cell door after

SERT exist and he did not remember seeing any injuries. Lt. Lavy stated that he was not there for Allen's medical evaluation.

200.    Plaintiff asserts that Defendant Daniel Lavy must be held liable for being deliberate indifferent to the injuries wrongfully inflicted upon the Plaintiff. Specifically the Plaintiff asserts that the Defendant wrongfully justified the other defendants actions without conducting any inquire at the moment when the Plaintiff was getting batter. Plaintiff asserts that it was Defendant Daniel Lavy's duty to walk closer to the incident in order to confirm the actions and steps being taken by the other defendants and to also thereafter make sure that he safety and wellbeing of the Plaintiff was not at risk. Plaintiff asserts that he may not have suffered the life long injuries had the defendant conducted his job professionally.

201.    Plaintiff asserts that Defendant Lavy had plenty of time to prevent the continuation of the batterment wrongfully inflicted upon the Plaintiff but chose not to. Plaintiff asserts that Defendant Daniel Lavy had plenty of time to react and intervene and that this fact is evident from the fact that Defendant Joseph Lee whom was standing outside of the cell near Defendant Lavy wrongfully ran into to the cell and used unnecessary force which the Defendant himself reported caused the Plaintiff to suffer injuries (swelling and confusion). Plaintiff asserts that Defendant Daniel Lavy therefore had such as much time as Defendant Lee did if he so wanted but rather instead decided to stand by and watch as the Plaintiff got wrongfully battered for another four to five minutes after Defendant Lee had entered the cell and thus stood by for approximately a total of eight to nine minutes watching the Defendant use excessive unnecessarily.

202.    Plaintiff asserts that Defendant Sergeant Keeney and Philip must also be held liable for being deliberate indifferent to the injuries suffered by the Plaintiff. Here, Plaintiff asserts that Defendant Philip went and got a camera instead of first making sure to intervene by demanding for the said defendant to stop wrongfully battering the Plaintiff. Moreover, the Plaintiff assert that once Defendant Philip found the camera and then begin record he could have still informed the Defendant to be cautious while cutting the Plaintiff closes off of his body but simply refused to do so. Plaintiff asserts that injury that he suffered to his arm by the defendants cutting him with the knife is an injury that Defendant Philip had time to prevent as it was a foreseeable injury.

203.    Plaintiff asserts that Defendant Sergeant Keeney must also be held liable for being deliberate indifferent to the injuries suffered by the Plaintiff. Specifically, Plaintiff asserts that Defendant Keeney was present during the time that the Plaintiff was getting batter and simply stood by and watched the Plaintiff get battered without instructing the Defendants subordinates to stop using excessive force and to thereafter be more cautious while cutting the Plaintiff's closes off as the non-combative and non-resisting Plaintiff was already handcuff and semi-conscious.

204.    Plaintiff asserts that the defendant deliberate indifference cause him to suffer from additional serious injuries which were both foreseeable and which could have thereafter been prevented. Plaintiff asserts that not only did the Defendants failed to intervene but they thereafter wrongfully attempted to force the other incarcerated individuals to get away from

their cell doors so that they could not witness the brutal batterment that was being wrongfully inflicted upon the semi-conscious and non-combative Plaintiff. These acts constitute elements which a competent person and a fair minded jurist would determine, upon sound reasoning, are a violations of Plaintiff right of being free of cruel and unusual punishment and thus would also therefore determine that the Defendant must be held liable for being deliberate indifferent of the injuries and abusive batterment wrongfully imposed upon the Plaintiff.

### AS AND FOR THE SIXTH THEORY OF THE CASE BY PLAINTIFF, NYEQUEST ALLEN, AGAINST DEFENDANTS TOBIAS SHELLEY, NATHAN HAWKER

205.    Plaintiff asserts that incarcerated individual within the Onondaga County Justice Center are wrongfully being starved and that the food proportions do not meet the minimum standards setforth by the law and which are not adequate nor calorie satisfactory for the incarcerated individuals. Plaintiff asserts that Defendant Tobias Shelley and Nathan Hawker have failed to provide incarcerated individuals with a menu and or with the ability of knowing the calorie intake because of the fact that the defendant knows that incarcerated individuals are wrongfully being deprived of adequate food proportions. Plaintiff asserts that the "Unknown Food Service Company" has been provided food to incarcerated individuals which have been violating the Muslims of their religious right to participate in their religion by not eating pork item and or which does not consist of the Jewish and Rastafarian belief of being provided with food that is sealed, hot meals that are blessed by the Rabbi within the local Onondaga County Community. Plaintiff asserts the company defendant in its official capacity has a contract which asserts that the Incarcerated individuals will get provided with sanitary food and of adequate proportions which meet the standards set forth by the Law.

206.    In this case, Plaintiff asserts that the "Unknown Food Service Company" Defendant ALONG WITH DEFENDANTS TOBIAS SHELLEY AND NATHAN HAWKER can conduct a survey which will reveal that incarcerated individuals whom are force to only eat three meals a day that are being provided by the "unknown Food Service Company" are losing excessive amount of weight and are thus also malnourished. Plaintiff asserts that defendants Tobias Shelley and Nathan Hawker have wrongfully allowed their subordinated whom are responsible for maintaining and supervising the food service operations within the Onondaga County Justice Center facility to fail to adequately wash the plastic trays and or provide new plastic trays for incarcerated individual to use and that the facility has rather instead attempted to use Styrofoam trays which are (1) wrongfully depriving the Plaintiff and other incarcerated individuals with adequate proportions of food and which have thereafter also give the defendant the opportunity of removing items from the trays which are going unnoticed by the cameras.

### AS AND FOR THE SEVENTH THEORY OF THE CASE BY PLAINTIFF, NYEQUEST ALLEN, AGAINST DEFENDANTS YOLANDA CANTY, TOBIAS SHELLEY AND NATHAN HAWKER

207.    Plaintiff assert that Defendant Yolanda Canty has been deliberate indifferent to the cruel and unusual punishment, discriminatory treatment and injuries wrongfully suffered by the Plaintiff. Specifically, Plaintiff asserts that defendant Yolanda Canty has had acknowledgment which show that the Onondaga County Justice Center has repeatedly been violating incarcerated

individuals constitutional rights because of the fact that the facility has wrongfully failed to uphold the HALT LAW. In this case, Plaintiff asserts that he presented a letter which explains of this fact and also spoke with represented "Paul" and "Rich" in order to inform the said defendants of the wrongful mistreatment being inflicted upon the Plaintiff on a daily basis.

208.    Moreover, Plaintiff asserts that it is defendant Yolanda Canty's responsibility to make sure that every local correctional facility along with every other correctional facility within New York State has adapted the new laws and rules established under Correction Law 137(5) and (6), and which applies to Local Correctional Facilities through Correction Law 500-k.

209.    Plaintiff asserts that he is being wrongfully punished as a result of bringing this fact to the Defendants' attention. Plaintiff asserts that it is the defendant responsibility as supervisors to make sure that the Onondaga County Justice Center meet the standards that have been set forth up Correction Law 137. Plaintiff asserts that the defendant must therefore be held liable for being deliberate indifferent to the cruel and unusual punishment being inflicted upon incarcerated individuals because of the fact that Correction Law 137 has been in effect for over three years now (became effective August 2nd 2021), and thus, the defendants cannot simply state that they were not aware of the law change.

## AS AND FOR THE EIGHTH THEORY OF THE CASE BY PLAINTIFF, NYEQUEST ALLEN, AGAINST DEFENDANTS QUKU, EARL, STARK, DEFENDANT (BADGE NO. 2606), DEFENDANT (BADGE 2740) AND MARC SARNO

210.    Plaintiff asserts that Defendants Quku, Earl, Stark and Marc Sarno must be held liable for being deliberate indifferent to the injuries wrongfully inflicted upon the Plaintiff. In this case, Plaintiff asserts that the said defendant were part of the Investigation procedure that was conducted in relation to the lawsuit complaint filed by the Plaintiff. Specifically, Plaintiff asserts that the herein said defendant were present during the investigation interrogation procedures and acted as legal representative and DSBA UNION representatives for the defendants whom battered the Plaintiff.

211.    Plaintiff asserts that the Defendants knew of fact and had evidence which clearly showed that the actions taken during the January 7th 2024 incident by the defendants was not only against the rules and regulations established by the Onondaga County Sheriff's Office but was actually against the New York State Laws and the Rights guarantee to every citizen within the United States as is setforth by the United States Constitution.

212.    Plaintiff asserts that the Defendant wrongfully attempted to justify the other defendants actions and thus were acting in a deliberate indifferent manner which further caused the Plaintiff injuries. Specifically, Plaintiff asserts that Defendant Dasilva acted in a manner which was very similar with to the actions committed by Defendants Randal Sanderson, Matthew Murphy, Alton Apples, Johnathan Hagenmayer and Joseph Lee. Plaintiff asserts that he said defendants are wrongfully exonerating Deputies for acts which they know are against the law and which are a violation of the rule and regulations established for all local Correction facilities under the New York State Minimum Standards and Regulations.

213.    Plaintiff has specifically presented evidence annexed along with this pleading which shows of the defendant participation during the Investigation Report conducted by the Internal Affairs Unit of the Onondaga County Sheriff's Office. Plaintiff asserts that the Defendants have a professional duty and responsibility of uphold justice and that such failure to act is a clear violation of due process of the law.

214.    Plaintiff asserts that the grievance committee has also deprived the Plaintiff of the opportunity of being able to adequately get the relief needed. Plaintiff asserts that the both Deputies and other staff member working within the ("OCJC") Facility are well aware of the fact that the facility doesn't have adequate camera surveillance capability nor of audio capability. Plaintiff asserts that the herein name Defendants and representative members of the DSBA UNION are supposed to have petitioned for that change and that the Defendant are required to have set in place of all of the rule, regulations and privileges available to prisoners under the mandate established by the HALT LAW and Correction Law 137.

COUNT FIVE: WRONGFUL CONFINEMENT
& DUE PROCESS VIOLATION
EIGHTH AMENDMENT VIOLATION
FOURTEENTH AMENDMENT VIOLATION

AS AND FOR THE NINETH THEORY OF THE CASE BY PLAINTIFF, NYEQUEST
ALLEN, AGAINST DEFENDANTS KOLAKOWSKI, JOHN S. DRAPIKOWSKI
AND NATHAN HAWKER

215.    Defendant Kolakowski must be held liable for violating the Plaintiff's fourteenth Amendment due process procedural rights. Specifically, Defendant Kolakowski wrongfully denied the Plaintiff of adequate assistance along with coerced the Plaintiff to pled guilty. The defendant further deprived the Plaintiff of presenting mitigating circumstantial evidence which would have revealed that it was not the Plaintiff whom initiated the altercations that occurred on the 7th day of January 2024 and on the 8th day of September 2024.

216.    Defendant Kolakowski further deprived the Plaintiff of his right to have adequate due process by (1) not commencing any Disciplinary Hearing procedure within the five day limitation established within the New York State Minimum Standards and Regulations, (2) wrongfully denying the Plaintiff of his opportunity to call witnesses, (3) Wrongfully denying the Plaintiff of his opportunity to get relevant documentary evidence along with other substantial video and audio evidence on his behalf, (4) wrongfully denying the Plaintiff of the opportunity of have assistance of any form and (5) by wrongfully preventing the Plaintiff from being able to adequately speak on the record during the Disciplinary Hearing proceeding that was conducted in relation to the September 8th 2024 batterment incident; and by (6) thereafter refusing to law the Plaintiff to participate any further in the Disciplinary Hearing proceeding by refusing to all for the said Plaintiff to be Present during the commencement of the Disciplinary Hearing procedures.

217.    Both Defendants John S. Drapikowski and Nathan Hawker must be held liable as of being the Chief Administration Officers whom wrongfully allowed for the unprofessional and

tortful confinement of the Plaintiff to continue even though they were aware of the Constitutional Violation being wrongfully inflicted upon the Plaintiff. The Minimum Standers and Regulations for New York State Local Correctional Rules has defined *The Chief Administrative Officer* to mean the highest-ranking facility official present during the time period in which a determination must be rendered. Both of Defendant meet part of this criteria because they hold the Position as Chief of the Custody Department for the Onondaga County Sheriff's Office and are also in charge of supervising and oversee the Disciplinary Hearing appeal process. Therefore, a competent person would reason that Defendants hold the responsibility of reviewing the **administrative confinement within 24 hours of such confinement in order to determine if continued confinement is warranted, and thereafter at intervals not to exceed seven (7) days.** A competent person would rationally reason that the Plaintiff was wrongfully confined in violation of the rule and regulations setforth by the New York Stated Minimum Standards and Regulations and that the Plaintiff also suffered from a violation of his Fourteenth amendment due process procedural right by Defendant Kolakowski conducting a bias and non-fair Disciplinary Hearing procedure.

218.    The appeal procedures setforth that: "(a) The inmate shall have the right to appeal the hearing officer's disposition and any sanction to the chief administrative officer. Such appeal shall be submitted in writing two business days of the inmate's receipt of the disposition, specifying the grounds for the appeal. (b) All appeals shall be reviewed and decided within five business days after receipt and each inmate shall be notified in writing of the results. (c) The chief administrative office may reduce or suspend all or part of the sanction, but not increase it."

219.    Plaintiff asserts that Defendant Kolakowski wrongfully deprived the Plaintiff of his right of having a fair and impartial Disciplinary Hearing by the Defendant wrongfully denying the Plaintiff to be Present at the Disciplinary Hearing Procedure conducted in connection to the allegations raised in the misbehavior report written against the Plaintiff by Deputy Dasilva. Therefore, Plaintiff assert that Defendant Kolakowski intentionally deprived the plaintiff of due diligence by wrongfully providing the Plaintiff with the copy of the decision notice papers days after the hearing was already conducted. Plaintiff thereafter assert Defendant Kolakowski also wrongfully rendered excessive amount of disciplinary sanctions upon the Plaintiff in a malicious manner in order to wrongfully confine the Plaintiff in the special Housing Unit as a form of Cruel and Unusual Punishment meant to subject the Plaintiff to atypical and significant hardship. Plaintiff asserts that Defendant Kolakowski's actions are prejudicial and must be viewed as of being in violation of Plaintiff's right to be free from cruel and unusual punishment. Specifically, Plaintiff asserts that there is not any substantial evidence which implicates that the Plaintiff acted in any wrongdoing manner and so the wrongful confinement of the Plaintiff in the Special Housing Unit after a biasly and improperly conducted Disciplinary Hearing Procedure stand as a clear violation of plaintiff's Fourteenth Amendment United States Constitutional Rights to Procedural Due Process.

220.    Plaintiff asserts that defendants John Drapikowski and Nathan Hawker thereafter wrongfully also failed to provide the Plaintiff with a written explanation **the specific facts and reasons underlying the determination** for the continuation of Plaintiff confinement in a segregated confinement unit. Plaintiff asserts that Defendant John Drapikowski wrongfully

agreed with the conclusory determination render by defendant Kolakowski and therefore wrongfully continued to confine the Plaintiff in the Special Housing Unite beyond the time limitation authorized by the New York State Minimum Standards and Regulations for Local Correctional Facilities; which setforth that:

5) Confinement to a cell, room; or in Special housing, as that term is defined in section 7013.2(h) of this Title, for a period consistent with the facility rules of conduct for the particular offense(s), subject to the provisions of Part 7-75, 7076 and 7077 of this Title, provided that:

    i.    No incarcerated individual of a special population may be sanctioned to segregated confinement;

    ii.    Except as authorized by subparagraph (iii) of this paragraph, **an incarcerated individual shall only be sanctioned to segregated confinement for up to three (3) consecutive days, and no Longer than six (6) days in any thirty (30) day period.**

    iii.    An incarcerated individual may be sanctioned to segregated confinement beyond the limitations of subparagraph (ii) of this paragraph or, in a facility with a maximum facility capacity exceeding five hundred (500), in a residential rehabilitation unit only if the disposition contains a finding that the individual committed a violent felony act, and if the **chief administrative officer determines in writing, based on specific objective criteria, the act was so heinous or destructive that placement of the individual in general population housing creates a significant risk of imminent serious physical injury to staff or other incarcerated persons, and creates an unreasonable risk to the security of the facility; and**

    iv.    For the purpose of subparagraph (iii) of this paragraph, the violent felony act of attempting to cause a serious disturbance or to escape **shall only be determined to have occurred if there is a clear finding that the incarcerated individual had the intent to cause a serious disturbance of the intent to escape and had completed significant acts in the advancement of the attempt to create a serious disturbance or escape.** Evidence of withdrawal or abandonment of a plan to cause a serious disturbance or to escape shall negate a finding of intent;

6) loss of a specific period of good behavior allowance, subject to restoration pursuant to applicable laws and regulations; and/or

7) loss of up to one hour of weekly visitation for a period consistent with the facility rules of inmate conduct for the particular offense.

221.    Plaintiff asserts that he had wrote numerous of grievances about the wrongful confinement and had even file a Civil Action Complaint pursuant to 42 U.S.C. §1983 which requested for judicial intervention so that the Plaintiff could get provided with the relief needed in curing the mistreatment wrongfully being inflicted against him. Plaintiff asserts that he had also notified Human Rights (Office of Diversity and Inclusion) so that he could get provided with the adequate assistance needed in getting the notification brought to the attention of the Chief Administration Officer's attention. Thereafter, Plaintiff asserts that he has exhausted all of the remedies available to him and that he still has not been provided with the adequate assistance needed. Plaintiff asserts that it is a mandate and not a discretionary

function for the Defendants to uphold the New York State Minimum Standards and Regulations. Plaintiff asserts that the Defendants actions must therefore be construed as of violation the Plaintiff's Fourteenth Amendment United States Constitutional right of being provided with adequate Procedure Due Process and of being treated in a fair and nondiscriminatory manner as setforth by the Eighth Amendment Equal Protection Clause.

COUNT SIX: DISCRIMINATORY TREATMENT
& RETALIATORY TREATMENT
EIGHTH AMENDMENT VIOLATION
FOURTEENTH AMENDENDMENT

AS AND FOR THE TENTH THEORY OF THE CASE BY PLAINTIFF, NYEQUEST ALLEN, AGAINST DEFENDANTS MATTHEW MURPHY, V. HUJDUR, DUSTIN SADDOCK, CONNOR HANAUER AND CASEY MCPARTLAND

222.    Plaintiff asserts that Defendants Casey McPartland And Dustin Saddock must be held liable for being deliberate indifferent to the retaliatory treatment wrongfully inflicted upon the Plaintiff. Specifically Plaintiff asserts that Defendant Dustin Saddock wrongfully allowed for Defendants Randall Sanderson, Matthew Murphy, V. Hujdur, Alton Apples and defendant Conner Hanauer along with other subordinate Deputies to wrongfully harass and mistreat the Plaintiff whenever Defendant Dustin Saddock was working (especially during the C Watch Shift which was his regular and steady work schedule).

223.    Plaintiff points this District Court's attention to paragraphs ¶¶149 through 158 demonstrate of the retaliatory treatment wrongfully inflicted upon the Plaintiff by Defendant Dustin Saddock, V. Hujdur and Randall Sanderson.

224.    Plaintiff highlights the fact that paragraphs ¶¶137 through 148 demonstrate of how Defendants Randall Sanderson and Matthew Murphy continue to wrongfully be deliberate indifferent to the constitutional violations being committed wrongfully by the defendants and other deputies within the Onondaga County Justice Center.

225.    Plaintiff asserts that paragraphs ¶¶130 and 131 plead of supplemental facts that demonstrate of how Defendants Conner Hanauer and Dustin Saddock wrongfully participated in the retaliatory treatment wrong inflicted upon the Plaintiff and of how the defendants refused to adequately cure the harmful mistreatment being inflicted upon the Plaintiff as a result of the Plaintiff exhausting his guaranteed constitutional right to petition to the government for a redress of grievances.

226.    Plaintiff asserts that paragraphs ¶¶132 through 135 plead of supplemental facts that demonstrate of how Plaintiff was wrongfully subjected to being housed in living conditions that are against the human decency standard set forth in the Eighth Amendment of the United States Constitution and which Plaintiff assert was wrongfully inflicted upon him as cruel and unusual punishment. Plaintiff asserts that Paragraphs ¶¶133 and 135 named Sergeant Casey McPartland as a new Defendant to the pleading.

227.    Plaintiff asserts that the continuation of harassment is a clear violation of the Plaintiff's right of being free from cruel and unusual punishment. Plaintiff asserts that the Defendants have wrongfully continued to deprive the plaintiff of human decency and that such retaliatory treatment is exact what the Eighth Amendment constitution has been set in place to prevent. Plaintiff asserts that he is thus asking for this District court to hold the defendants accountable for their unprofessional actions and for their tortful behaviors.

COUNT SEVEN: DISCRIMINATORY TREATMENT
& DUE PROCESS VIOLATION
EIGHTH AMENDMENT VIOLATION
FOURTEENTH AMENDENDMENT

AS AND FOR THE ELEVENTH THEORY OF THE CASE BY PLAINTIFF, NYEQUEST ALLEN, AGAINST DEFENDANTS KOLAKOWSKI, JUSTIN LEUBNER, DAVID SQUAIRS, LIEUTENANT WOODS, R. DOBROWOLSKI, JAMMIE BLUMER,), CHIEF FURGUSON & DSBA UNION

228.    Plaintiff asserts that defendant Kolakowski must also be held liable for being deliberate indifferent to the cruel and unusual punishment and of the discriminatory treatment wrongfully inflicted upon the Plaintiff. Specifically, Plaintiff asserts that Defendant Kolakowski intentionally sentence the Plaintiff to excess amount of time in the Special Housing Unit and that the said defendant keeps depriving the Plaintiff of an opportunity of have a fair and impartial Disciplinary Hearing.

229.    Plaintiff asserts that Defendants Justin Leubner, David Squairs, a "JOHN DOE" lieutenant Defendant and Lieutenant woods must also be held liable for being deliberate indifferent to the discriminatory treatment wrongfully inflicted upon the Plaintiff because it is their responsibilities as Grievance Committee supervisors to investigate and provide cure to the injuries and torment wrongfully being inflicted upon the Plaintiff and other incarcerated individuals within the Onondaga County Justice Center. Plaintiff asserts that the said defendant would wrongfully justifiable the tortful actions committed by the defendant inferior deputies and would disregard that the fact that the defendants actions were in complete violation of the rules and regulations established within the New York State Minimum Standards and regulations for Local Correctional facilities. Plaintiff asserts that his "Agent's"(Saio Barzee "Power of Attorney") Grand Jury transcripts indicate that staff member working within the Onondaga County Justice Center facility are under the knowledge and understanding that the Onondaga County Justice Center cameras are in the process of getting reconstructed because they are out of date and inadequate. Therefore, Defendants David Squairs, Justin Leubner and Lieutenant wood must be held liable for the cruel and unusual punishment being wrongfully inflicted upon the Plaintiff because they knew that the defendant and other deputies would intentionally fabricate matters to them and would still thereafter provide fabricated reason for the wrongfully actions committed by the defendant and other deputies. Plaintiff asserts that a competent person and a fair minded jurist would conclude that the Defendants David Squairs, Justin Leubner  and Lieutenant Woods justified the defendants and other deputies actions in order to cover up for the mistakes and tortful actions committed by their inferior deputies and staff members.

230.    Plaintiff asserts that Defendants Jammie Blumer, R. Dobrowolski, Chief Ferguson and Justin Leubner must be held liable for being deliberate indifferent to the cruel and unusual punishment and discriminatory treatment wrongfully inflicted upon the Plaintiff. In this case, Plaintiff asserts that the defendants failed to fire and discipline the Defendants whom battered him after an investigation into the matters being complained about by the Plaintiff. Plaintiff asserts that Defendant Jammie Blumer, Chief Ferguson and R. Dobrowolski must be held liable for being deliberate indifference to the cruel and unusual punishment and discriminatory wrongfully suffered by the Plaintiff. Plaintiff asserts that the two said defendant are in charge of overseeing and supervising the Internal Affairs department of the Onondaga County Justice Center.

231.    Plaintiff asserts that he called the Internal Affairs phone number on numerous of occasions in order to complain about his mistreatment without getting any form of cure.. Plaintiff also he continues to get mistreated and that he actually got physically assault again by Defendant Dasilva after Filing his 42 U.S.C. §1983 Civil Action lawsuit against Defendants Randall Sanderson, Alton Apples and Matthew Murphy. Plaintiff asserts that Defendant Jammies Blumer and R. Dobrowolski are well aware of the mistreatment being inflicted upon incarcerated individuals both within the Onondaga County Justice Center and within Jamesville Correctional facility which is also own and operated by the Onondaga County Sheriff's office but that the defendant fail to properly supervise and discipline the deputies whom have continued to severely batter incarcerated individuals (Elijah Vrealand (whose defendant are Dustin Saddock, Fodaro, Alton Apples and V. Hujdur), the Plaintiff himself (twice)(whose defendants are named herein), Jamal Works (whose defendants are Alton Apples and etc.), Willie Curtis, Ozell Stanley (Defendant Sanderson and etc.) and the list goes on). Defendant Jammie Blumer and R. Dobrowolski are wrongfully **exonerating** the defendants of wrongdoing even though they have evidence that show that the said defendants are not only guilty of the tortful actions alleged but should not be working as deputies for the Onondaga County Sheriff's Office because they do not know how to conduct themselves in a professional manner and are rather instead violating the law.

232.    The herein named defendants are wrongfully allowing for the discriminatory treatment and cruel and unusual punishment that is being inflicted upon the Plaintiff and other incarcerated individual to be a normal custom within the Onondaga County Justice Center and thus are continuing to put the Plaintiff health and safety at risk as well as other incarcerated individuals. The defendant negligence is wrongfully encouraging the other defendants to act with the acknowledgment that there will not be any form of repercussion for their behavior.

233.    Plaintiff asserts that the DSBA UNION must be held liable for the cruel and unusual punishment along with the discriminatory treatment being wrongfully inflicted upon the Plaintiff and other incarcerated individuals within the Onondaga County Justice Center stemming from the fact that it is their responsibility to train, supervise and discipline the Deputies (and herein named Defendants) whom are in charge of overseeing the daily activities within the said local Correctional facility. Plaintiff has submitted substantial documentary proof which stands as supportive evidence that further reveals of the discriminatory and bias nature of the DSBA UNION operations and which also show of how the said DSBA UNION

is acting deliberate indifferent to the injuries being suffered by incarcerated individuals. Plaint asserts that the evidence is obtain from the Internal Affairs reports (case number 24-072) in connection to Defendant R. Dobrowolski investigation conduct about the malicious batterment inflicted upon the Plaintiff. Plaintiff asserts that the Investigation Report reveals that the Onondaga County Sheriff's Office had clear proof of both illegal criminal activity along with constitutional violations but wrongfully neglected to provide the cure required by law and thus supported the cruel and unusual punishment unnecessarily inflicted upon the Plaintiff. Thereafter, Plaintiff asserts that DSBA UNION representives were present throughout the entire investigation and that unprofessional suggestion and inadequate investigation method were applied both on the record and off of the record in relation to the investigation conducted. Plaintiff asserts that the Defendants who battered the Plaintiff thereafter have battered other incarcerated individuals as well as continue to wrongfully harass the Plaintiff for litigating civil matters for the benefit of both Nyequest Allen and other incarcerated individuals dealing with the same and or similar issues.

234.    Plaintiff asserts that DSBA UNION has thus incited and or fuel the mistreatment by showing the Defendant who are a direct reflection of the criminal judicial system as they are representatives of the Onondaga County Sheriff's Office that they may violate the law, as well as the rights of citizen (for detainees are still entitled to many of the right guaranteed for regular citizen within regular citizen because the United States Constitution has setforth that every person and Citizens of the United States is Innocent until proven guilty) without any form of punishment, discipline or repercussion being rendered against them for their tortful actions.  Plaintiff asserts that the DSBA UNION is thus wrongfully promoting the ideology which encourage for the Onondaga County Sheriff's Office to convince its employees (Deputies working within the Onondaga County Justice Center) to believe that they are above the law.

COUNT EIGHT: FAILURE TO TRAIN, DISCIPLINE, HIRE AND SUPERVISE
EIGHTH AMENDMENT VIOLATION & FOURTEENTH AMENDMENT VIOLATION
(N.Y.S. CONST. "BILL OF RIGHTS") ARTICLE ONE, SECTION FIVE VIOLATION

AS AND FOR THE TWELFTH  THEORY OF THE CASE BY PLAINTIFF, NYEQUEST
ALLEN, AGAINST DEFENDANTS JOHN S. DRAPIKOWSKI, NATHAN HAWKER,
TOBIAS SHELLEY AND THE DSBA UNION

235.    Plaintiff asserts that Defendant John S. Drapikowski must be held liable for being deliberate indifferent to both the cruel and unusual Punishment and discriminatory treatment wrongfully inflicted upon Plaintiff. In this case, Plaintiff asserts that defendant Drapikowski wrongfully failed to discipline and supervise the inferior deputies working within the Onondaga County Justice Center and that the said defendant instead allowed for the Deputies to wrongfully continue to inflict psychological torment and physical abuse upon incarcerated individuals within the said local facility. Plaintiff asserts that Defendant Tobias Shelley wrongfully failed to discipline defendant John S. Drapikowski and rather instead just simply gave the said defendant the responsibility of overseeing the Jamesville Correctional Facility after questions about the Defendants capability of adequately supervising the operations of the Onondaga County Justice Center were raised.

236.    Plaintiff asserts that Nathan Hawker has not changed the wrongful customs and illegally conducted procedures being applied within the Onondaga County Justice Center after defendant John S. Drapikowski was removed from the responsibility of supervising and overseeing the daily operations of the Onondaga County Justice Center. Plaintiff asserts that Defendants Nathan Hawkers continued negligence and Defendant Tobias Shelley's lack of further inquiry into the concerns and tortful actions being wrongfully inflicted in the Onondaga County Justice Center stand as evidence that the defendants simply applied a "Code Blue" scheme (meaning they simply portrayed the wrongful image as if the defendants had provided cure to the injuries inflicted wrongfully upon the incarcerated individuals, only for the purpose of satisfying the media, and society when in all actually no real justice has been rendered which cures the tortful behaviors being wrongfully applied every days within the Onondaga County Justice Center) inorder to let the unwanted attention die down a little bit before allowing for their deputies (and employees) to return back to their regular unprofessional and tortful customs to be put back into operations.

237.    Plaintiff asserts that Tobias Shelley must be held liable (within his "Individual capacity") for being deliberate indifferent to the cruel and unusual punishment and discriminatory treatment being inflicted upon Plaintiff because of the fact that the Plaintiff had personally wrote to the defendant without getting any form of cure. Plaintiff asserts that Defendant Tobias Shelley has been well informed about the Unprofessional and illegal activities that have been occurring within the Onondaga County Justice Center but that the Defendant has neglected to adequately provide any form of justifiable and reasonable cure. Plaintiff asserts that the News media has constantly reported of the abuse and mistreatment wrongfully inflicted upon the Plaintiff without the defendant firing any of the wrongdoers. Plaintiff asserts that Defendant Tobias Shelley is also well aware of the fact that the Defendants' have wrongfully attempted to previously prevent the Defendant from being able to know of the tortful actions (as noted in the Newspaper Article published when Ozell Stanley was wrongfully battered severely by deputies) and that the defendant hasn't set in stone an enforcement of an adequate grievance committee and for the Internal Affairs office to be more active and alert to the mistreatment complained about by incarcerated individuals being housed within the Onondaga County Justice Center.

238.    Plaintiff asserts that Defendant Tobias Shelley's refusal to provide reasonable remedy to the constitutional injuries suffered by the Plaintiff and other incarcerated individuals stands as proof of the Defendant's culpable state of mind in being deliberate indifferent to the cruel and unusual punishment inflicted upon the Plaintiff and other incarcerated individuals. Plaintiff asserts that the defendant has the responsibility to fire, suspend, mandate retraining, anger management, and or rehabilitation programs that will put an end to the tortful actions wrongfully inflicted upon the Plaintiff. Moreover, the Plaintiff asserts that the defendant could and demote (downgrade) and or put fines on the Sergeants, Lieutenants, Captains and chiefs for the negligence in supervising and disciplining their subordinates. Plaintiff assert that defendant Tobias Shelley's failure of discipline his employees and subordinates are reflected in the Tortful actions that continue to occur within the Onondaga County Justice Center. Also Plaintiff asserts that Defendant Tobias Shelley has failed to uphold his promise which he declared after the Ozell Stanley assault. Specifically Plaintiff asserts that New reporter Emma

Misiaszek reported on Tuesday, February 20th 2024 at 3:39 PM EST (Under the New Article entitled as "Onondaga Co. Sheriff's Office clears deputies of assault after inmate's beating claim") that Defendant Tobias Shelley had stated:

**"In response to this incident, Shelley said that the office would look into securing body cams for deputies at the Justice Center after a spokesperson for the office told CNY Central in January that the responding deputies did not have body cams.**

**"We will get the funding for more cameras and get them on the deputies on fifth floor, because had there been a camera involved, this wouldn't be an issue. We wouldn't even be having this conversation"'**

239.    Plaintiff would also like to highlight the fact that Civil Rights attorney Norman Deep even asserted, under the New Article heading of **"Sheriff Shelley says there is no video of alleged 'beating' inside downtown jail"**, that he was **"highly critical of law enforcement effectively investigating themselves"** by stating: **"In my entire career, and I'm 78 years old, I have never seen them (police) say 'yea this guy is guilty and abused this inmate'".**

240.    Plaintiff asserts that Defendant Tobias Shelley must be held liable for being deliberate indifferent of the cruel and unusual punishment wrongfully being inflicted upon the Plaintiff and other incarcerated individuals within the Onondaga County Justice Center. Plaintiff asserts that it is a known fact that the cameras are inadequate and or inoperable but that the Defendant has still failed to uphold his promise of fixing the inadequate supervising ability of the facility. Moreover, Plaintiff asserts that Deputy Casey McPartland even further proved this notion by testifying about the lack of camera surveillance available within the Onondaga County Justice Center and that Defendant Provided this testimony under oath of penalty of perjury at the Grand Jury proceeding conducted on the behalf of the Plaintiff's "Power of Attorney" (Incarcerated Individual Saio Barzee (ICN NO.11001866), Plaintiff's "Agent") on the 12th day of September 2024 (see the grand Jury Minutes submitted along with this complaint for verification).

241.    Therefore Plaintiff asserts that Defendant Tobias Shelley must be held liable for failing to Train, Hire, Supervise and discipline the subordinate Deputies working within the Onondaga County Justice Center. Plaintiff asserts that the Defendant has wrongfully disregard evidence of the Deputies wrongdoing and instead as attempted to cover up the defendants wrongdoing. Plaintiff asserts that the defendants actions as evidence of criminal activities which are against the law. Plaintiff asserts that the defendants are supposed to be fired after killing and or severely battering incarcerated individuals unjustifiably. Moreover, upon information and belief, the Plaintiff asserts that Defendant Tobias Shelley wrongfully mislead the public and the news reporter by asserts that the Ozell Stanley incident occurred in the housing unit of 5A because 5A is not the housing unit for mental health active incarcerated individuals. Plaintiff asserts that 5C is the Housing Unit for incarcerated individuals with serious and or severe mental health issues. Plaintiff further asserts that 5A still has not been thoroughly equipped with surveillance cameras and that 5C is still an area Deputies use to assault and batter incarcerated individuals under the false pretense that they are suicide. Plaintiff asserts that deputies severely batter and assault incarcerated individuals and then justify the excessive use

of force by declaring that the incarcerated individuals were attempting to hurt themselves and or hurting one of their staff member. On the other hand, Plaintiff asserts that, if true, then it shows of the fact that the ("OCJC") Facility has wrongfully made it a custom of housing incarcerated individual in Housing Units that they do not belong in and thus supports the facts raised herein by Plaintiff.

242.    The DSBA UNION must be held liable for failing to train, supervise and discipline the Onondaga County Justice Center Deputies (and the herein named Defendants) for the reasons setforth within paragraphs ¶ 281 and ¶ 282, and because of the fact that the said Union has wrongfully failed to cure the continuation of unprofessional actions and constitutional torts being wrongfully committed by the defendants and or Deputies. Plaintiff asserts that the DSBA UNION has wrongfully failed to provide cure to the injuries being suffered by the Plaintiff and other incarcerated individuals within the Onondaga County Justice Center. Plaintiff asserts that the DSBA UNION is supposed to fire member which the DSBA UNION knows committed illegal activities and or acted in a manner which violated the laws established for incarcerated individuals under Correction Law 137 (5) And (6). Plaintiff asserts that the continuation of illegal activity is clear evidence that the DSBA UNION has failed to Hire, Train, Discipline and Supervise its employees.

INJURIES

243.    Plaintiff asserts that he is permanently deaf and or has a lifetime loss of hearing from his left ear. Plaintiff asserts that this is a serious injury with a medical doctor would determine shock the mind and conscious. Plaintiff asserts that the excessive amount of force used wantonly and unnecessarily caused for the said injury to wrongfully inflicted upon him. Plaintiff asserts that he is actually must legally be diagnosed as of being disabled and thus makes his injuries not de minimums. Plaintiff asserts that not only is he suffering from extreme emotional and psychological pain as a result of the unjustifiable batterment that was inflicted upon him unnecessarily. Plaintiff asserts that he still gets nightmares and that he has wrongfully been subjected to unnecessary fear for his health and safety as a result of the tortful actions unjustifiably and unreasonably inflicted upon him wrongfully by the same people assigned to supervise and watch him while he is being housed in the local correctional facility. Plaintiff asserts that he has been verbally torment and physically assaulted by the People who are in-charge of providing him protection. Plaintiff assert that he has an uneasy feeling of being attacked every time he is around the defendants whom actually participated in the assault (Specifically, Defendants Randall Sanderson, Alton Apples, Joseph Lee, and Matthew Murphy).

244.    Plaintiff asserts that his medical injuries are thoroughly documented. Plaintiff asserts that page 17 of 35 (pertaining to the Investigation Report filed by Defendant r. Dobrowolski) stated that:

**"Dep. Lee wrote that that he gave verbal direction during his response to resistance and utilized empty hand-soft technique, which resulted in swelling/contusions to Allen and no injuries to Dep. Lee."**

Page 30 of 35 states:

"According to Dep. Sanderson, **during the nurse's evaluation, Allen complained about his mouth and his lip.** He also said that he did not now he was going to get his millions and repeatedly threatened staff."

Page 23 of 35 states:

"SERT Video Review (MAH004300 0:00:00 – 0:08:03)

- 0:00:04 – Inmate Allen is standing by the cell door, and appears to have trouble standing up, using the cell door as support. He appears to be grimacing.
- 0:00:14 – As Dep. Apples approaches the cell door alongside the nurse, inmate Allen can be heard saying, "you all tough. You all real tough". The Nurse can be heard asking, "you ok?" to which inmate Allen replies, "Yo Ms. My skull. The Kneed me" and it appears that he has trouble saying anything else. The Nurse asks, "what's going on honey?" and inmate Allen appears to begin to sob.
- 0:00:46 -- the nurse informs inmate Allen, who still has not responded, that she is going to take his vitals.
- 0:00:52 – Inmate Allen, who appears t have stopped sobbing and seems to be concentrating on the deputies and not the nurse, states, "You all tough. You all real tough. You tough Apples. You a black man (intangible) me like that. You tough."
- 0:01:14 – Dep. Apples provides inmate Allen with clothing, which he delivers through the meal slot. After receiving the clothing and while putting it on, inmate Allen states, "You tough. Word to my daughter, mark my words, the next time this door opens I'm gonna break one of you all. You hear me?" Inmate Allen then makes a statement about a "lawsuit", the context of which I can ascertain and that he will get "monies back".
- 0:01:39 – Inmate Allen informs the nurse that he thinks he needs to go to the hospital while grimacing and groaning. He then sits back onto the bunk, while the nurse asks him to come up to the cell door so that she can take his blood pressure through the meal slot.
- 0:02:17 – As inmate Allen get up from the bunk, he walks up to the door, and tells the nurse to look at his face and to look at his head: "You can tell they just beat on me. Look at my Face." He also makes a claim that the Deputies did not have the camera on before they started beating him and that was against the Law.
- 0:02:46 – Dep. Sanderson issues commands to inmate Allen so that he can apply handcuffs to him through the meal slot and is then told to go and sit on the bed. Inmate Allen follows Dep. Sanderson's orders.
- 0:03:06 – Dep. Sanderson, Dep. Apples and Dep. Murphy, along with the nurse, enters inmate Allen's cell. Lt. Lavy stays outside of the cell, observing while the nurse examines inmate Allen. During the examination, inmate Allen states that he feels in danger for his safety.
- 0:03:46 – Inmate Allen tells the Deputies that he cannot believe they beat him and tells Dep. Apples that he is wrong because he (Dep. Apples) is a black man.

Page  24 of 35 states:

- 0:04:17 – Inmate Allen tells the Nurse, "My head hurts so bad" continues to tell them look at his face.
- 0:05:09 – Inmate Allen begins to laugh out loud for several seconds and then states, "I swear to god, yo. I come home. I come home the 30th. I come home the 30th. I swear the god on my daughter, you better hope I don't catch one of you all." He also states something about "fucking up" and "doing life", however, I can't clearly make out his statements, as his head is down. According to Dep. Murphy's and Dep. Sanderson's reports, Inmate Allen told them that he did not care if he did life in prison, he would kill one of the Deputies.
- 0:05:37 – Dep. Murphy points out that while claiming that he is afraid of the Deputies, he continued to make threats against them. Inmate Allen claims that the Deputies "jumped him in a group" and kneed him in his face and back while he was handcuffed.
- 0:05:50 – Inmate Allen makes another threat, even though seconds before he was claiming that the Deputies were "twice my size". He stated, "You take these off right now. I shake with you all. Word to my mother I wont press charges or nothing". What's up! I'll show you tough! What's up! Take that badge off, take that vest off."
- 0:06:30 – Inmate Allen asks the nurse to tell them that he needed to go to the hospital because his head hurt and was "swelling up real bad".
- 0:07:26 – Deputies, along with the nurses exist the cell and the door is secured. Dep. Sanderson uncuffs inmate Allen through the meal slot. Before the video ends, inmate Allen can be heard asking for a phone call.

End of video.

**Nyquest Allen's Medical Records:**

As a part of the investigation, I obtained and reviewed Allen's medical records following the Response to Resistance incident and noted the following:

In her Nursing Progress Note added on 01/07/2024 at approximately 2117 hours, Nurse Sheridan wrote that she was "called to POD for assessment of patient post SERT move. Patient is lying on the floor with eyes closed. Bottom lip bloody. Patient then got up and stood at door. He was very agitated and started screaming and threatening staff. Vitals were taken while patient sat handcuffed on the bed. VSS. No obvious injury to head or extremities. Will continue to monitor."

245.    Plaintiff asserts that he suffered from physical injuries which were visual at the time of medical evaluation. Plaintiff asserts that he was later diagnosed as of being permanently deaf as a result of the excessive force used wrongfully. These said injuries as consistent with the "Wantonly and Unnecessary" standard.

246.    Plaintiff asserts that not only is he suffering from extreme emotional and psychological pain as a result of Defendant Conner along with the other unknown "John Doe" Deputies wrongfully disclosing of his request to be housed into protective custody. Plaintiff asserts that he has wrongfully been abused and verbally tormented as a result of the wrongful disclosure

of confidential and private information. Plaintiff's reputation of being a jailhouse "rat" or "snitch" has deprived the Plaintiff of social life and has wantonly and unnecessarily created tension between Plaintiff and some of the Plaintiff's prior friends and thus has discorded some friendships.

247.    Plaintiff asserts that he is being wrongfully deprived of the ability of being able to socialize with rational people and of social life by being wrongfully isolated in the Special Housing Unit (where he has not been provided with the ability to listen music or watch TV shows, sports and or read about the news, sports or social events that are occurring in regular society). Plaintiff asserts that he is further being deprived of socialization by wrongfully being subjected to further isolation as a result of being housed in the four-man unit where it is only the Plaintiff, Incarcerated individual Saio Barzee and other an incarcerate individual (Bryan Washington) whom is suffering from severe mental health problems.

248.    Plaintiff asserts that this type of isolation is what the New York State HALT LAW along with the rights established under Correction Law 137 (6) were put in place to prevent. Plaintiff asserts that the confinement conditions inflicted upon him are "atypical and significant hardship" compare to the living conditions available to other incarcerated individual within the Onondaga County Justice Center and are also considered "atypical and significant hardship" because of the fact that the said condition are what the new law were put in place to stop as a result of realizing of the consequential damages that they have on the minds and emotions of incarcerated individuals whom are wrongfully subjected to such wantonly and unnecessary isolation.

249.    Plaintiff asserts that he has lost excessive amount of weight while being wrongfully confined in the Special Housing Unit and has been forced to deal with inhumane living conditions which were cruelly inflicted upon plaintiff in a wantonly and unnecessary malicious manner. Plaintiff asserts that he has wrongfully subjected to wearing sock, T-shirts and boxers which still have the appearance of looking dirty even after the Plaintiff hand washes the clothes himself and has wrongfully been subject to having to wear these said clothes for months at a time. Plaintiff asserts that he was wrongfully confined in a feces infested cell which still smelled like feces even after the Plaintiff had cleaned the cell on numerous of occasions and which still had dried up feces in the crest of the cell's floor, door and corner of the cell's walls. Plaintiff asserts that he was wrongfully subjected to being housed in cells which intentionally blows out extremely cold air and this was while the Plaintiff did not as of yet have a thermal top and bottoms. Plaintiff asserts that he has been denied of the opportunity of getting physical therapy for his left hand as requested and that the medical department knows that the Plaintiff's left hand got wrongfully slammed in the door b the Deputies but refuse to provide and or reached out to any form of outside medical department for further evaluation to be conducted in order to determine if other remedies of cure are available for the Plaintiff's injury.

250.    Plaintiff asserts that Defendant Alton Apples wrongfully subjected the Plaintiff to be wrongfully served with food which looked, smelled and were definitely unhygienic and or had been tamper with unknown hazardous substances. Plaintiff asserts that he has wrongfully been subjected to smaller proportion of food and has even be deprive of the right to get a

double proportion and or a high protein/high calorie diet). Plaintiff asserts that he is getting "soft trays" diets (which consist of Styrofoam trays), unjustifiable, even though he does not refused to give back the trays and has to actually constantly remind the deputies to collect the trays.

251.    Plaintiff asserts that he has been written numerous of misbehavior report which fabricate event that further stop the Plaintiff from escaping the cruel and unusual living conditions wrongfully inflicted upon Plaintiff as malicious punishment. Plaintiff thereafter asserts that he has also been fined 25$ dollars on numerous of occasion and thus has been stripped of the opportunity of making commissary purchases which could have been used to buy legal supplies and hygiene products.

VI.                              PRAYOR OF RELIEF

252.    Plaintiff is requesting for the compensation of $ Ten Million United States Dollars ($10,000,000.00° U.S. Dollars) as a result of the slander and defamation of his character and as compensation for the punitive damages being wrongfully inflicted and suffered by the Plaintiff. Plaintiff is also requesting for damages for being wrongfully confined in "atypical and significant hardship" conditions unjustifiably. Plaintiff is also requesting to be compensated for the amount of money that he had lost due to the misbehavior ticket feet rendered unjustifiably. Plaintiff is also requesting to be Immediately remove from the special housing unit and to be thereafter be housed back in the Protective Custody Unit and or in 2C general Housing Unit as a result of already being confined wrongfully for at least six months straight.

253.    Furthermore, Plaintiff herein assert that he is requesting for an Injunction Order, Pursuant to Rule 65 of the Fed. R. Civ. P., which compels Defendant Yolanda Canty, Nathan Hawker, John S. Drapikowski and Defendant Tobias Shelley (within his "Official" capacity) to uphold the Laws setforth for every other Local Correctional Facility being operated within New York State. Plaintiff asserts that he is requesting that Defendant Tobias Shelley "Show Cause" of why this Court should not render a declaratory judgment, Pursuant to Rule 53 of the Fed. R. Civ. P., that states that the Onondaga County Justice Center in wrongfully violating the New York State Minimum Standards and regulations as is setforth by 9 NYCRR 7001 et seq. and of the rules and regulations set in stone for incarcerated individuals under Correction Law 137(5) and (6) and which applies to local correctional facilities pursuant to Correction law 500-k. Plaintiff asserts that the standards setforth under the New York State Correction Laws are supported by the Eighth Amendment United States Constitutional rights which provide that incarcerated individuals are still entitled to "Human Decency" and that Cruel and Unusual punishment is prohibited. Plaintiff therefore also asserts that the Eighth Amendment Constitutional rights apply to the state through the Fourteenth Amendment Due Process Clause.

254.    Furthermore, Plaintiff herein assert that he is requesting for an Injunction Order, Pursuant to Rule 65 of the Fed. R. Civ. P., which compels Defendant Tobias Shelley (within his "Official" capacity) to uphold the Laws setforth for every other Local Correctional Facility being operated within New York State. Plaintiff asserts that he is requesting that Defendant

Tobias Shelley "Show Cause" of why this Court should not render a declaratory judgment, Pursuant to Rule 53 of the Fed. R. Civ. P., that states that the Onondaga County Justice Center in wrongfully violating the New York State Minimum Standards and regulations as is setforth by 9 NYCRR 7001 et seq. and of the rules and regulations set in stone for incarcerated individuals under Correction Law 137(5) and (6) and which applies to local correctional facilities pursuant to Correction law 500-k. Plaintiff asserts that the standards setforth under the New York State Correction Laws are supported by the Eighth Amendment United States Constitutional rights which provide that incarcerated individuals are still entitled to "Human Decency" and that Cruel and Unusual punishment is prohibited. Plaintiff therefore also asserts that the Eighth Amendment Constitutional rights apply to the state through the Fourteenth Amendment Due Process Clause.

255.    Plaintiff asserts that he is requesting for an Injunction Order, Pursuant to Rule 65 of the Fed. R. Civ. P., which compels Defendant Nathan Hawker to enforce his subordinates to provide incarcerated individuals with adequate clothing(orange sneakers, t-shirts, boxers, socks and etc), free weekly legal materials (**manila envelope** (for legal mailing) along with regular envelope, **Carbon Paper**, **Certified mail return receipt forms**), and legal assistance (an opportunity to get pro se Assistance for both criminal and civil litigation purpose—right now the facility only acknowledge Pro Se status to incarcerated individuals whom are Pro Se for their pending Criminal Cases which there are detained for only), provide incarcerated individual with pillows (cause Plaintiff is suffering from neck injuries from trying to use in clothes as a blanket), provide incarcerated individuals with the opportunity of exchanging their blankets and sheets on a weekly basis, Provide the incarcerated individuals with tablets while being housed within the Special Housing Unit, remove the Plaintiff and other similar incarcerated individuals from the Special housing Unit who have been in the Said Special Housing Unit beyond the time limitations authorized by correction law 137 (6) and section §706.7 of the N.Y.S. Minimum Standards and Regulations.

256.    Plaintiff asserts that he is requesting for the "Unknown food service Company" that presently has a contract with the Onondaga County Sheriff's offices, and which thereafter is in-charge of providing food to the incarcerated individuals being housed within the Onondaga County Justice Center, to provide the Plaintiff and the Court with a copy of its "**menu**" of all of the meals served daily throughout the week and or weeks, and of the calorie intake each meal provides for incarcerated individuals (because the facility keeping wrongfully informing the Plaintiff that there is no menu). Plaintiff is also asking for an Injunction Order to be rendered which thereafter instructs for the "Unknown food service company" Defendant to provide the Incarcerated individuals with adequate proportions of food so that incarcerated individuals will stop losing weight at such rapid and unhealthy rates. Plaintiff also ask that the facility staff member in-charge of serving the food start utilizing cleaner and healthier ways of serving food and cleaning the messhall trays and utensils that are being used on a daily basis by incarcerated individuals. Plaintiff asserts that the facility just serves two thin slices of bologna and cold "American" cheese slice on Monday, Wednesday, Friday, Saturday and sometimes on Sunday lunch meals every week. However, Plaintiff asserts that the dinner meals that follow the some proportionate lunch meals do not adequate provide adequate calorie intake amounts for incarcerated individuals.

257.    Plaintiff asserts that he is requesting for an Injunction Order, Pursuant to Rule 65 of the Fed. R. Civ. P., which compels Defendant Tobias Shelley to commence with criminal prosecution against the Deputies and Defendants who have wrongfully assaulted the Plaintiff and whom have also assault other incarcerated individuals wrongfully. Plaintiff asserts that he would like to be provided with a copy of any accusatory instrument filed in relation to his request for the commencement of criminal charge to be prosecuted and that this District Court also be provided with the opportunity to inspect such accusatory instrument. Plaintiff asserts that he is asking for this District Court to prosecute the defendants pursuant to 18 U.S.C. §242 for committing criminal acts which are inconsistent with the laws establish within the New York States Penal Law Chapter, and which are a clear violation of the Plaintiff's constitutional rights, if Defendant Tobias Shelley wrongfully fails to commence with criminal charges as requested herein.

258.    Plaintiff asserts that he is requesting for a preliminary Injunction Order, Pursuant to Rule 65 of the Fed. R. Civ. P., which compels Defendant Tobias Shelley to mandate that the Defendant's subordinates restrain from: (1) the continuance calculated harassment (malicious cell searches, violation of food, verbal slander and verbal abuse, etc.) and mistreatment of the Plaintiff, (2) restrain from wrongfully battering the Plaintiff and the Plaintiff's "Power of Attorney"(Saio Barzee, ICN No.11001866) in retaliation for the Plaintiff commencing with this 42 U.S.C. §1983, (3) restrain from depriving the Plaintiff of the relief request herein (adequate proportions of food, adequate law library, adequate clothing, adequate living conditions, and adequate health care), (4) restrain from further denying the Plaintiff's "Power of Attorney"(Saio Barzee, ICN No.11001866) of his Pro Se Status privileges in retaliation for helping Plaintiff Amend and Supplement this 42 U.S.C. §1983, (5) restrain from any other and further forms of mistreatment in relation to the facts asserted herein.

VII.                    PLAINTIFF'S CERTIFACTION AND WARNINGS

By signing below, the Plaintiff, along with his "Power of Attorney" (Saio Barzee, ICN No.11001866 ("Agent")), certify to the best of their knowledge, information and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) The factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rules of Civil Procedure 11.

Plaintiff understands that if he files three or more cases while he is a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, that Plaintiff may be denied in forma pauperis status in future cases.

Plaintiff also understands that Prisoners must exhaust administrative procedure before filing an action in federal Court about prison conditions, 42 U.S.C. §1997 €(a), and that his case may be dismissed if he has not exhausted administrative remedies as required.

Plaintiff agrees to provide the clerk's office with any change to his address. Plaintiff understands that his failure to keep a current address on file with the clerk's office may result in the dismissal of his case.

Respectfully submitted,

_Nyequest Allen_

Nyequest Allen aka Nyquest Allen
ICN No.15000405
Nyequest Allen("Principal") Plaintiff
Onondaga County Justice Center
555 South State Street
Syracuse, New York 13202-2104

_Saio Barzee_               (*SB-Z)
Saio Barzee ("Agent" and "Power of Attorney")
ICN No.11001866
Onondaga County Justice Center (*same address as Plaintiff)

Pursuant to 28 U.S.C. §1746, it is declared under the penalty of perjury that the foregoing is true and correct.

Date on which PLAINTIFF is delivering this Amended and Supplemented Complaint to prison authorities for mailing:

DATED: Thursday, November 7th, 2024
            SYRACUSE, NEW YORK

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

NVQUEST ALLEN

Plaintiff(s),

v.

ONONDAGA COUNTY SHERIFF, COUNTY OF
ONONDAGA, STATE OF NEW YORK
Defendant(s).

_____

FILED

MAR - 8 2024

AT_____ O'CLOCK_____
John M. Domurad. Clerk - Syracuse

U.S. DISTRICT COURT N.D. OF N.Y.

**COMPLAINT**
(Pro Se Prisoner)

Case No. 9: 24-cv-332
(Assigned by Clerk's
Office upon filing)

**Jury Demand**
☒ Yes
☐ No

---

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's social security number, taxpayer identification number, or birth date; the name of a person known to be a minor; or a financial account number. A filing may include *only*: the last four digits of a social security number or taxpayer-identification number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. *See* Fed. R. Civ. P. 5.2.

---

I.    **LEGAL BASIS FOR COMPLAINT**

This is a civil action seeking relief and/or damages to defend and protect the rights guaranteed by the Constitution and laws of the United States. Indicate below the federal basis for your claims.

   ☒ 42 U.S.C. § 1983 (state, county, or municipal defendants)
   ☐ *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971) (federal defendants)
   ☐ Other (please specify) _____

## II.    PLAINTIFF(S) INFORMATION

Name:                     NYQuEST ALLEN

Prisoner ID #:            15000405

Place of detention:       Onondaga County Justice Center

Address:                  555 S. State St.

                          Syracuse, NY 13202

Indicate your confinement status when the alleged wrongdoing occurred:

- ☒ Pretrial detainee
- ☐ Civilly committed detainee
- ☐ Convicted and sentenced state prisoner
- ☐ Convicted and sentenced federal prisoner
- ☐ Immigration detainee

Provide any other names by which you are or have been known and any other identification numbers associated with prior periods of incarceration:

_____

If there are additional plaintiffs, each person must provide all of the information requested in this section and must sign the complaint; additional sheets of paper may be used and attached to this complaint.

## III.    DEFENDANT(S) INFORMATION

Defendant No. 1:    Onondaga County Sheriffs Office
                    Name (Last, First)

                    Deputy's
                    Job Title

                    555 South State street
                    Work Address

                    Syracuse    New york    13202
                    City        State       Zip Code

Defendant No. 2:    Sanderson
                    Name (Last, First)

                    Onondaga county Deputy's
                    Job Title

2

Case 9:24-cv-00332-L[    EK-TWD    Document 1    Filed 03/08/24    Page 3 of 7

555 South State street
Work Address

Syracuse    Ny    13202
City            State            Zip Code

Murphy
Name (Last, First)

**Defendant No. 3:**

Onondaga county deputy
Job Title

555 South state street
Work Address

Syracuse    Newyork    13202
City            State            Zip Code

Sample
Name (Last, First)

**Defendant No. 4:**

Onondaga county deputy
Name (Last, First)

Onon[   south state street
Job Title

555 -[   Newyork    13202
Work Address        State        Zip Code

Syracus[
City

[   [in]formation requested in this section must
If there are additional defendants, the [   ts of paper may be used and
be provided for each person; additional shee[
attached to this complaint.

## IV.    STATEMENT OF FACTS

[   aims. Describe the
State briefly and concisely the facts supporting your cl[   cts should include the
events in the order they happened. Your statement of fa[
following:

- The date(s) on which the events occurred        [   d, if relevant, the
- Where these events took place (identify the facility an[
  specific location in the facility)

3

○ How each defendant was involved in the conduct you are complaining
about

If you were physically injured by the alleged misconduct, describe the nature of
your injuries and the medical evaluation and treatment you were provided. You
need not cite to case law or statutes or provide legal argument in the Statement
of Facts. Use additional sheets of paper if necessary.

On the date of 1-7-24
to lock in was called in A refusal
county Justice center Syr onondaga
unit protective custody special housing
team's deputy's Sanders AS (SERT)
Apples Was Who Response Murphy and
(Nyequest Allen) corresponded I
and layed on the Floor With order's
on the ground (Sandor as I an
hand cuffed Me w/anderson & Murphy)
going on I alert hile this Was
My cuff's Were (deputy sanderson
and if he could violently) tight
they ignored loosen them
My request

V.    STATEMENT OF CLAIM(S)

State briefly and concisely the constitutional and/or statutory basis for each claim
you seek to assert and identify the defendant(s) against whom each claim is

4

asserted. Commonly asserted claims include: excessive force; failure to protect; deliberate indifference to medical needs; unconstitutional conditions of confinement; denial of due process in a disciplinary or other proceeding; denial of equal protection; retaliation for the exercise of a First Amendment right; and interference with free exercise of religion. Legal argument and case citations are not required. Use additional sheets of paper if necessary.

### FIRST CLAIM

Excessive Force

### SECOND CLAIM

Failure to Protect

### THIRD CLAIM

Cruel & unusual punishment
pain & suffering

## VI. RELIEF REQUESTED

State briefly what relief you are seeking in this case.

remedy's for pain & suffering physical
and mental pain cruel & unusual punishment
3 Million $

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 3-1-24                 Nyquest Allen
                              Plaintiff's signature
                              (All plaintiffs must sign the complaint)

(revised 10/2/16)

5

As (Sert) team proceeds to take Me to the big box that's when I noticed (Sert) did (not) have a camera present as they escort Me to the big box which is (Onondaga County rules for Sert) so if anything happens that deputy's did or do have proof other wise. As I get to the big box I was layed on a Mattess inside (A) cell as Sanderson & Murphy start to take My cuffs off I said Ahh My wrist you hurting Me that's when the assault started while Sanderson Murphy & Apples held Me down Sanderson & Murphy used thay Fist & knee as if they were weapons hitting Me over & over again so much I needed Medical attention. As nurse (Kate) came she noticed sever swelling to My head & face I asked nurse (Kate) who just seen Me the night before about a abcess in My Mouth I asked nurse (Kate) My face wasn't just like this? was it? she then states (on camera) No it was not! the reason why I asked is cause I noticed that one of the deputy's had a camera out at that Moment!!)

Nyequest Allen
Claimant, pro se

Dated: ~~███████~~

[2 of 2]

On the next day 1-8-24 a nurse who Name I don't know that well seen Me about the severe swelling on my left side of my face a cut on My right ear & the mark's on both wrist's How bad violently tight the cuff's were but she had to schedule for x-ray's on my head & left wrist to make sure there wasn't a fracture. On the date of 1-9-24 I called human right's to tell them what happened to me I told her names of inmates who where & still are willing to speak up about what they saw) & heard those names are Zaylon Rodriguez Clyde Gesbrick (Zaylon was in 27 cell & saw everything (Clyde) was in 31 cell and only heard but told mental Health worker (Adam) who I will call for a witness as well as (Kate) & the other's I mentioned I would also like to state that these onondaga deputy's have history of hurting assaulting & using excessive force I wrote Nys commission of correction's in Albany, Ny Human Right's worker seen & noted the mark's & scar's from the after effect Mental health worker (adam) noted about My scar's on my wrist's. Here we are in (2-4-24) & (I still have marks on left & right wrist) I am prepared to (pro se.)A 1983 civil lawsuit against New york state onondaga county deputy's (Sanderson Murphy & Apples) for violating My (eighth Amendment) Pain & suffering physical & Mental pain I still can't hear out My (left ear) I'm alway's depressed & now it's more like nightmare's I Am seeking (remedy's for ~~[struck through]~~)    Nyguest Allen

~~[struck through]~~( ~~[struck through]~~ psychological )    Claismant, Pro se
                    Trauma
        ( Cruel & unusual punishment )
            [ 3 of 3 ]